**COMMONWEALTH OF MASSACHUSETTS**
Plaintiff
V.
**ELM MEDICAL LABORATORIES INC.,**
**DR. Attilio BAEZ-GIANGRECO**
**Joan ATTIANESE**
**DEPARTMENT OF PUBLIC HEALTH**
**DR. Alfred L. FRECHETTE, and**
**Nancy T. RIDLEY, Defendants**

No. 41839

Superior Court
Commonwealth of Massachusetts

**August 11, 1981**

Francis X. Belotti, A.G., counsel for plaintiff

Sally Kelly, Asst. A.G., counsel for plaintiff

Bernadette Zabra, Asst. A.G., counsel for plaintiff

W. Paul Needham, counsel for defendant

## Introduction

Taken as true, see, **Nader v. Citron**, 372 Mass. 96 (1977), the allegations of defendants Elm Medical, Dr. Baez-Giangreco and Ms. Attianese (hereinafter collectively referred to as Elm) in their amended cross-claim describe a course of conduct by the government defendants which destroyed Elm's business without once giving Elm an opportunity to present its version of the facts to a neutral factfinder. By means of press releases and press conferences, during which the government defendants purported to factually report on the quality of Elm's services, the government effectively discouraged potential customers from utilizing Elm's pathology laboratory services. This adverse publicity has forced Elm into bankruptcy and continues to interfere with the ability of the individuals involved to work in their chosen profession. Although the government's tortious conduct is specifically excepted from coverage under the Massachusetts Tort Claims Act, G.L. c. 258, for reasons more fully set out below I rule that Elm's claim that it was denied due process under the Massachusetts Civil Rights Act, G.L. c. 12, sec. 11I, survives this motion to dismiss.

## I. Allegations

On April 22, 1980, the Massachusetts Department of Public Health (Department) along with the Federal Department of Health and Human Services conducted a joint state-federal inspection of Elm Medical Laboratory. A joint inspection of this type, requested by the Department and lasting five full working days, had never before been conducted in the history of the Department. Indicative of the bad faith in the inspection, Elm alleges that on one occasion during the inspection period, Nancy T. Ridley, Director of Survey Operations for the Department, appeared during the inspection accompanied by persons having no connection with the Department and in a loud, inebriated state, harassed and intimidated employees of Elm. While the inspection was in progress, Ridley consented to an interview with a Channel Four investigative team, during the course of which she divulged information pertaining to the inspection of Elm. Elm disputes the accuracy of the information reported.

After observing the operational procedures employed by Elm and as a result of other information gathered in the course of the inspection, Ridley urged the Attorney General to file an action to enjoin Elm's operations under G.L. c. 93A, sec. 4. The Attorney General made an **ex parte** motion for a temporary restraining order which was granted on May 9, 1980. The Department failed to notify Elm of the impending action and made no attempt to insure Elm's participation nor to request voluntary action by Elm to discontinue operations temporarily.

On May 19, 1980, Channel Four news aired an investigative report which was based in part on information secured from the Department and focused on Elm's operations. Forewarned of this investigative report and its contents, beginning on May 14, 1980, Elm attempted to have the Department

conduct a second inspection of its operations. The officials at Elm felt that a properly performed inspection would both vindicate Elm and diminish the impact of Channel Four's report. For reasons known only to the Department, it failed to conduct another inspection until July 21, 1980, and then only upon threat of judicial action.

On July 2, 1980, the Department issued an "Health Alert" at a well-attended press conference. The Alert purported to notify all former Elm clients, both physicians and patients, that Elm improperly screened or actually misread PAP smear tests,[1] placing some women at risk. According to Elm, the alert contained inaccurate statements and projections about the quality of Elm's services.

On July 21, 1980, the Department conducted a second inspection of Elm utilizing pathologists from Veterans Administration hospitals. The pathologists have conducted other inspections for the Department for a fee. Although the chief of the investigative team indicated he would recommend that Elm reopen, the report released by the Department reached a contrary conclusion, allegedly occasioned by Ms. Ridley's influence over the process. The Department has continued to contact Elm clients to inform them of the Department's purported factual determinations.

## I. Massachusetts Tort Claims Act

In enacting G.L. c. 258, sec. 2, inserted by St. 1978, c. 512, sec. 15, this Commonwealth has taken a giant first step toward developing a rational scheme of governmental liability that is consistent with accepted tort principles and the reasonable expectations of the citizenry with respect to its government. Cf. **Whitney v. Worcester**, 373 Mass. 208, 215 (1977). Nevertheless, as with the Federal Tort Claims Act after which the Massachusetts Act was modeled, See, 28 U.S.C. sec. 2671 **et seq.**, numerous exceptions limit the reach of the Act,

particularly limitations of liability with respect to deliberate torts. See, G.L. c. 258, sec. 10(c). Since the Act counsels that liability be imposed on the Commonwealth "in the same manner and to the same extent as a private individual under like circumstances . . .", G.L. c. 258, sec. 2, the task for this Court is to ascertain the thrust of the complaint as if it involved private individuals. See, **Black v. Sheraton Corp. of America**, 564 F.2d 531, 539 (D.C. Cir. 1977). Since the Act excepts from its coverage certain deliberate torts, this Court must carry out the additional duty of determining whether a complaint which states a cause of action under one of the barred torts also states a separate cause of action under a theory which is not barred. See, **Quinones v. United States,** 492 F.2d 1269, 1273 (3rd Cir. 1974); see also, Comment, 6 Rutgers Camden L.J. 842 (1975). In the present case, the government conduct complained of reduces to four types of tortious activities, all of which are barred by the statutory exceptions contained in G.L. c. 258 secs. 10(b), 10(c).

## A. Pretrial Publicity, the "Health Alert" and Continued Public Statements

The publicity engendered by the Department in connection with its early investigation as well as the issuance of the Health Alert and subsequent announcements are actionable in this Commonwealth against a private person under a libel or slander theory. See, **Myers v. Boston Magazine Co.**, 1980 Mass. Adv. Sh. 907; **National Association of Governmental Employees, Inc. v. Central Broadcasting Corp.**, 1979 Mass. Adv. Sh. 2485. Although Elm couches its allegations in terms of negligent gathering and processing of data, clearly the publication caused the harm. As libel and slander, these actions are specifically excluded from compensation under the Act. G.L. c. 258, sec. 10(c). See, **Mizokami v. United States**, 414 F.2d 1375

---

[1] The PAP smear is a screening test for cancer of the cervix.

(Ct. Cl. 1969). See also, Gellhorn, **Adverse Publicity by Administrative Agencies,** 86 Harv. L. Rev. 1380, 1437 (1973). In view of this disposition, I need not consider whether any privilege attached to the communications. See, **Sriberg v. Raymond,** 370 Mass. 105, 109 (1976); **Sullivan v. Birmingham,** 1981 Mass. App. Ct. Adv. Sh. 326, 328-329; Restatement (Second) of Torts secs. 586, 587, 604, 605 (1977). Elm has failed to suggest, and this Court has been unable to discover, any cause of action in negligence under the facts alleged. See, **Quinones v. United States,** 492 F.2d at 1278 (Pennsylvania law would recognize duty to use due care in keeping and maintaining employment records independent of an action for libel). Cf. Restatement (Second) of Torts sec. 324A (Liability to Third Person for Negligent Performance of Undertaking).

## B. Ex Parte TRO Application

Elm's allegation that the Department should have first consulted with it to negotiate a voluntary settlement before resorting to the courts sounds in malicious prosecution, and hence is excluded by the Act. G.L. c. 258, sec. 10(c). See, **Hubbard v. Beatty & Hyde, Inc.,** 343 Mass. 258, 260-261 (1961); Restatement (Second) of Torts secs. 674-677 (1977). Any negligence on the part of the Department in failing to ascertain the accuracy of the data supplied to it stands as one of the elements of this tort. See, **Hubbard v. Beatty & Hyde, Inc.,** 343 Mass. at 261-262. **United States v. Neustadt,** 366 U.S. 696, 702 (1961) (putative negligence action merged with claim barred by 20 U.S.C. sec. 2680(h) ); see, **also** Restatement (Second) of Torts sec. 675, comment c, sec. 662, comment g.

## C. Failure to Reinspect

As an alternative negligent act which might occasion liability, Elm alleges that the Department should have reinspected Elm's facilities prior to the airing of Channel Four's investigative report. Elm has failed to tie this allegation to any duty mandated by statute, required by regulation or extent in the common law. Unlike the situation in **Indian Towing Co. v. United States,** 350 U.S. 61 (1955) in which the government, by undertaking to provide lighthouse service, became obligated to perform inspections to insure that the lighthouse remained in good working order, the Department did not require any common law duty to reinspect once Elm officials believed they had achieved compliance with applicable standards. **Compare** Restatement (Second) of Torts sec. 321 (Duty to Act When Prior Conduct Is Found To Be Dangerous) **with** sec. 324A (Liability to Third Person for Negligent Performance of Undertaking). Even assuming some common law duty to act, any decision regarding subsequent reinspection in light of the Department's recent adoption of inspection procedures, see, Complaint, Par. 4, comes within the ambit of the Department's discretionary functions. G.L. c. 258, sec. 10(b).

## D. Subsequent Inspection

Elm's final tort theory, interference with the second inspection, alleges no tort. G.L. c. 258, sec. 10(b). Other than describing every act undertaken by the Department and the team as "negligent", Elm has failed to adequately explain the basis of any negligence theory. Cf. Restatement (Second) of Torts secs. 321, 324A. Although Elm claims that the head of the inspection team stated he would recommend that Elm reopen, Elm was closed under order of the Superior Court, not the Department. Assuming some power on the part of the Department to permit reopening, any allegation to the effect that a recommendation that Elm not reopen caused Elm's poor condition to continue would appear to suggest libel or slander, and is therefore excluded in any event. G.L. c. 258, sec. 10(c).

## III. Massachusetts and Federal Civil Rights Acts

General Laws, chapter 12, section 11H, inserted by St. 1979, c. 801, sec. 1

guarantees to all persons the right to the peaceable exercise or enjoyment of rights secured by the Constitution or laws of the United States or of the Commonwealth.[2] Section III of G.L. c. 12 confers a private right of action on persons whose exercise or enjoyment of rights secured by the Constitution or laws of the United States or of the Commonwealth has b⋅⋅n interfered with by threats, coercion or intimidation. As a remedy, a court may award both equitable relief as well as compensatory money damages. Although the Act in spirit tracks the Federal Civil Rights Act, 42 U.S.C. sec. 1983, by its terms the Massachusetts Act extends to a broader range of circumstances.

Elm claims, under both the Federal and state Civil Rights Acts, that the Department's release of publicity without giving Elm a chance to be heard deprived Elm of a valuable property right without according it due process of law. The guarantee of due process is contained in both the Fourteenth Amendment to the Federal Constitution as well as in Article X of the Declaration of Rights of the Massachusetts Constitution. The protection afforded property interests by both provisions is subject to the same analysis. **School Committee of Hatfield v. Board of Education,** 371 Mass. 513, 515 n.2 (1977).[3]

### A. Protected Interests

The due process analysis currently undertaken by the United States Supreme Court determines whether or not the asserted right is a protected interest under state law, **e.g., Board of Regents v: Roth,** 408 U.S. 564, 571 (1972). If state law guarantees some legitimate claim of entitlement, the state may not impair enjoyment of the protected interest absent some fundamentally fair procedures. See, **Goss v. Lopez,** 419 U.S. 565, 572-574 (1975); **Hathaway v. Commissioner of Insurance,** 1980 Mass. Adv. Sh. 161, 164-165; **Haverhill Manor, Inc. v. Commissioner of Pub. Welfare,** 368 Mass. 15, 23-25 (1975).[4] Under

[2] G.L. c. 12, § 11H provides:
Whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, the attorney general may bring a civil action for injunctive or other appropriate equitable relief in order to protect the peaceable exercise or enjoyment of the right or rights secured. Said civil action shall be brought in the name of the commonwealth and shall be instituted either in the superior court for the county in which the conduct complained of occurred or in the superior court for the county in which the person or persons whose conduct complained of reside or have their principal place of business.

[3] In **Lowell Gas Co. v. Department of Public Utilities,** 324 Mass. 80, 87 (1949) the Court noted:
The Constitution of this Commonwealth contains safeguards against deprivation of property without due process of law "at least as strong as those of the Fourteenth Amendment to the United States Constitution." **Pizer v. Hunt,** 253 Mass. 321, 332.

I take this language to mean that in appropriate circumstances the Massachusetts Constitution may extend protections beyond those afforded by the Federal due process clause. See also, **Blue Hills Cemetery, Inc. v. Board of Registration,** Mass. Adv. Sh. (1979) 2647, 2652 n.8; Wilkins, **Judicial Treatment of the Massachusetts Declaration of Rights in Relation to Cognate Provisions of the United States Constitution,** 14 Suffolk L.Rev. 880, 889-890, 910-911, 914-920 (1980).

[4] The Supreme Court's pronouncement of this principle, together with the rather uneven application which the principle has received, has drawn heated criticism from at least one distinguished commentator. 2 K. Davis, Administrative Law Treatise §§ 11:1 - 11:14, at 341-403, §§ 13:1 - 13:15, at 473-522 (1979). In his treatise, Professor Davis frequently remarks that the case law about protected interests lacks a unifying principle. **Id.** at 343, 345. In an attempt to bring some consistency to the Supreme Court's treatment of due process, Professor Davis has suggested a unifying principle which is consistent with fifty of the fifty-eight Supreme Court decisions on the subject. **Id.** § 11:14, at 399-401. That principle proposes that when officers impose a grievous loss on any person, due process requires not less than whatever procedural protection is justified by a cost-benefit analysis. **Id.** at 399. Although I app-

Massachusetts law, the right to engage in any lawful occupation is an aspect of the liberty and property interests protected by the substantive reach of the due process clause of the Fourteenth Amendment to the United States Constitution and analogous provisions of the Constitution of the Commonwealth. **Blue Hills Cemetery, Inc. v. Board of Registration,** 1979 Mass. Adv. Sh. 2647, 2651. But the same constitutions that create the right leave it vulnerable to qualification or restriction by any valid exercise of the Legislature's police power. **Id.**

Both the United States Congress and the General Court have seen fit to act in the area of clinical laboratories by establishing various certification and licensing requirements. The Secretary of Health and Human Services is authorized to certify a clinical laboratory as qualified to receive Medicare reimbursement payments if the laboratory meets all the criteria laid down by Federal regulations. See, 42 U.S.C. sec. 263a. The Federal officials do not themselves conduct inspections to determine clinical laboratory compliance with the applicable standards. Rather, by 42 U.S.C. sec. 1399aa the Secretary of Health and Human Services is ordered to utilize the services of the appropriate state health agency to recommend certification. Certification provides the certificatee with a protected property interest. See, **Hathaway v. Mathews,** 546 F.2d 277, 230 (7th Cir. 1976); **Town Court Nursing Center, Inc. v. Beal,** 586 F.2d 266, 277 (3rd Cir. 1978).[5]

The General Court has given the Department of Public Health responsibility for public health matters in the Commonwealth. G.L. c. 111, sec. 5. The Department derives more specific authority over health care resource providers from G.L. c. 111, sec. 25A. Finally, the Department has been given specific authority to license clinical laboratories and to revoke licenses or sanction licensees. G.L. c. 111D, secs. 5,

11. The Department's authority to sanction has been qualified by strict procedural requirements designed to safeguard the rights of licensees.[6]

ly the analysis adopted in the cases noted above, I believe that the result is consistent with Professor Davis' approach.

[5] The **Town Court** case did not specifically hold that certification results in a protected property interest. Rather, the Court stated that the procedures established under 42 U.S.C. § 1395aa were sufficient to protect whatever interest the nursing home had in continued participation in the Medicare and Medicaid programs. **Town Court Nursing Center, Inc. v. Beal,** 586 F.2d at 277. The **Hathaway** case specifically held that under certification procedures contained in 42 U.S.C. § 1396 a(a)(33)(B), which are analogous to those in 42 U.S.C. § 1395aa, the nursing home operator had a protected property interest in continued receipt of payments. **Hathaway v. Mathews,** 546 F.2d at 230.

[6] G.L. c. 111D, § 11 provides:

The department may revoke the license issued under section five or impose other appropriate administrative sanction upon a licensee, or both, for conduct by or chargeable to him as follows: (1) failure to observe any term of such license; (2) failure to meet any requirement for such license established under section five; (3) failure to observe any order made under authority of this chapter or under other statutory authority vested in the department; (4) engaging in, or aiding, abetting, causing, or permitting, any action prohibited under section eight; or (5) other proper cause set forth in regulations made under this chapter.

Before sanctioning a licensee, the department shall give such licensee notice of the charges against him, the provisions of law relied upon, and the proposed sanction, and shall afford him the opportunity for a hearing under the provisions of chapter thirty A. Where, after hearing, it finds that cause exists for imposition of a sanction, it need not impose the sanction proposed but may instead impose a lesser sanction if, in its judgment, a lesser sanction is appropriate in the circumstances. In the event revocation is imposed, the licensee shall be permitted a reasonable period in which to cease operation, but in no case less than thirty days after notice of the decision of the department.

Notwithstanding any other provision of this section, the commissioner may, at any time upon notice to the licensee, whether a hearing has been first commenced or not, suspend his license or issue such other preliminary order as the commissioner considers appropriate for the protection of the health or safety of the public if he should find that either is in jeopardy: provided, that a hearing shall be commenced within five days after such notice in any case of suspension without a prior hearing unless the

Licencing provides the licensee with a protected property interest. Although the Department has had authority to license clinical laboratories since 1976, see, St. 1975, c. 881, sec. 1, the Department has so far failed to exercise its authority. At this time the Department only certifies a clinical laboratory's Medicare eligibility to the Secretary of Health and Human Services, a procedure which was followed in this case.[7] In view of the Department's official role in the certification process.[8] Elm had a legitimate claim of entitlement to continued receipt of Medicare funds, which claim was protected from termination by the state unless some procedural protection was afforded. See, **Hathaway v. Commissioner of Insurance,** 1980 Mass. Adv. Sh. at 165; **Haverhill Manor, Inc. v. Commissioner of Pub. Welfare,** 368 Mass. at 23; **Hathaway v. Mathews,** 546 F.2d at 230.

**B. What Process Is Due Prior to Release of Adverse Publicity**

While termination of Elm's Medicare certification by the Secretary of Health and Human Services clearly requires a pretermination hearing (absent an emergency situation justifying a post-termination hearing) see, **Hathaway v. Mathews,** 546 F.2d at 230-232, the amount of procedural protection, if any, which must be afforded before an agency may take action which falls short of termination is less clear. The fact that the state rather than the Federal authorities effected the damage also serves to cloud the analysis, since the interest protected revolves around receipt of Medicare payments. But see, note 8 **supra.**[9] Consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action. **Haverhill Manor, Inc. v. Commissioner of Pub. Welfare,** 368 Mass. at 24; see, 2

K. Davis sec. 11:14, at 399.

**1. Government Function**

The importance of the Department's action in communicating information pertaining to public health has already been noted by a justice of the Appeals Court, who stayed a Superior Court order enjoining the Department from making or causing to be made any public statement in the nature of a Health Alert or similar oral or written announcements concerning Elm Laboratories. **Commonwealth v. Elm Medical Laboratories,** Appeals Court No. 80-

---

licensee shall request a postponement. The finding of the commissioner shall be included in such notice.

[7] Although Elm has not alleged that certification was ever obtained, the Attorney General alleged in the original complaint that the Department of Public Health inspected and certified Elm, and that Elm was certified at all times relevant to this action, Complaint, paragraph 10, an allegation of which I may take judicial notice. **Littleton Industries, Inc. v. Peerless** Ins. Co., Mass. App. Ct. Adv. Sh. (1981) 951, 953.

[8] Arguably, the Department's failure to carry out its mandate to license clinical laboratories should not abort the Legislature's attempt to create a protected interest in the operation of clinical laboratories. Cases which have discussed the creation and definition of the dimensions of property interests clearly contemplate that these rights may have a common law as well as a statutory origin. **See, e.g., Haverhill Manor, Inc. v. Commissioner of Pub. Welfare,** 368 Mass. at 23. **See also,** Wilkins, **supra** note 3 at 888. **Cf.** 1 K. Davis, Administrative Law Treatise § 2:19, at 143-146, § 6:11, at 494-496 (1978). To the extent that the certification determinations parallel determinations which would be made if the Department were to undertake licensure, it seems that Elm should benefit from the intended creation of a property interest. **Cf. Bigelow v. R.K.O. Radio Pictures, Inc.,** 327 U.S. 351, 264 (1964).

[9] The nature of the interest protected may have a significant impact on the damage calculation. If Elm's only protected interest were in continued receipt of Medicare payments, then Elm's only compensation would be for the loss of Medicare amounts, and not its entire business. On the other hand, if Elm had a legitimate claim of entitlement to continue operating, guaranteed by either G.L. c. 111D, § 11, or by the common law, its damages would theoretically be much greater.

0203-CV. (issued July 22, 1980 per Kass, J.). Noting the fundamental principle that governmental authorities have the right to make public information acquired by them which is of interest to the public, the Court upheld the issuance of the injunction only insofar as it pertained to a statement which would be read in a fashion which would cause it to communicate facts which were false. Slip Opinion at 5. Other cases have pointed out the importance of informing the public of imminent harm. See, **Federal Trade Comm'n v. Cinderella Career & Finishing Schools, Inc.,** 404 F.2d 1308, 1314 (D.C. Cir. 1968); See also, Gellhorn, **Adverse Publicity by Administrative Agencies,** 86 Harv. L. Rev. 1380, 1382-1383, 1384-1398, 1407-1419 (1973). The General Court has shown its acute awareness of the need to warn the public by explicitly authorizing the Department to publish analyses, reports and interpretations of information collected under G.L. c. 111, G.L. c. 111, sec. 25A, to disseminate information relating to diseases, G.L. c. 111, sec. 25, and, with respect to clinical laboratories in particular, to make informational materials available to the public and to engage in such other activities as may be necessary or appropriate for the administration or enforcement of G.L. c. 111D. G.L. c. 111D, sec. 2. Additionally, the General Court has authorized the commissioner, upon notice of the licensee, to issue any preliminary order which the commissioner considers appropriate for the protection of the health or safety of the public if he should find that either is in jeopardy. G.L. c. 111D, sec. 11. Although several distinguished commentators have argued against an agency's unfettered ability to issue press releases as it sees fit, **e.g.,** Gellhorn, 86 Harv. L.Rev. at 1419-1421; 2 K. Davis sec. 13:4, at 485-486; J. Mashaw and R. Merrill, **The American Public Law System** at 377-383 (1973), none question the importance of this power when utilized under proper circumstances. These circumstances would include situations in which failure to issue publicity would cause serious harm to the public, in which less harmful alternatives to publicity are nonexistent, in which the accuracy of the information to be released had been established by proper procedures, in which the potential harm to the target of the publicity had been weighed, and in which the affected party had some opportunity to be heard prior to release. See, Gellhorn, 86. Harv. L. Rev. at 1425-1429.

### 2. Private Interest

The private interest affected by an agency's release of adverse publicity is potentially enormous. In some cases such publicity has ruined reputations and sent corporations and whole industries into bankruptcy. See, Gellhorn, 86 Harv.L.Rev. at 1408-1410, 1413, 1428-1429; J. Mashaw and R. Merrill, **The American Public Law System** at 377. Professor Gellhorn has collected in his article several well-known incidents in which agency publicity had a devastating impact. Included are the 1959 cranberry episode, in which the entire year's crops went unsold due to a mistaken report released shortly before Thanksgiving that the crop had been treated with a cancer-causing chemical, **id.** at 140-8-1410, and The Bon Vivant incident, in which the company went bankrupt after it was announced that its products were contaminated with botulin. **Id.** at 1414. In the present case, the Department's release of the information in the form in which it was released had a readily foreseeable, if not intended, impact. Public sensitivity to health issues has always been high. See, **id,** at 1417-1418. Physicians would certainly not risk utilizing a laboratory described by the Department as the subject of an ongoing investigation for improper screening and misreading of PAP smear slides.

### 3. **Balancing—Is Process Ever Due?**

Although the foregoing analysis

indicates that in some circumstances due process requires that release of publicity be ɩ eceded by some opportunity to be heard, few reported cases on agency use of publicity seem to consider due process concerns. See, **Kukatash Mining Corp. v. Securities & Exchange Comm'n,** 309 F.2d 647, 650 (D.C. Cir. 1962) (no requirement of a hearing prior to dissemination of information that stock is not eligible to be sold); See also, **Carlsberg v. Gatzek,** 442 F. Supp. 813, 817-818, 818 n.2 (C.D. Cal. 1977) (SEC practice of releasing public announcements of allegations in complaint does not constitute a denial of due process); **Relco, Inc. v. Consumer Product Safety Comm'n,** 391 F. Supp. 841, 846-847 (S.D. Tex. 1975) (statute which provides for full hearing after the fact of publicity release fulfills due process requirements); **Ajay Nutrition Foods, Inc. v. Food & Drug Administration,** 378 F. Supp. 210, 217-218 (D.N.J. 1974) **aff'd** 513 F.2d 625 (3d Cir. 1975) (court lacked jurisdiction to decide question of whether due process requires a hearing prior to release of true information in press release); **Hoxsey Cancer Clinic v. Folsom,** 155 F. Supp. 376, 378 (D.C.D.C. 1956) (statute which authorizes Food & Drug Administration to disseminate information and warn public without according affected party notice and hearing does not deny due process). In the only extended discussion of the issue, Chief Judge Bazelon argued in dissent in **Kukatash** that the Secretary's dissemination of publicity did implicate the plaintiff's due process rights. **Kukatash Mining Corp. v. Securities & Exchange Comm'n,** 309 F.2d at 652-653, 652 n.7, 653 n.9, 10 (Bazelon, C.J., dissenting). Although Judge Bazelon would not have required a predissemination hearing due to the urgent need for prompt warning, he would have required a hearing soon after the dissemination. See, **Id.** at 652-653. In the **Cinderella Career & Finishing School** case, the affected party had an opportunity to contest the FTC's decision to issue a press release before the agency, removing that question as an issue in the case. **Federal Trade Comm'n v. Cinderella Career & Finishing Schools, Inc.,** 404 F.2d at 1309-1310.

Several explanations for this apparent lack of consideration of due process concerns present themselves. First, many Federal agencies have adopted internal publicity guidelines which, if followed, might supply the requisites of due process. See, Gellhorn, 86 Harv.L.Rev. at 1388 (noting FTC procedures), 1394 (noting SEC procedures). **Compare Federal Trade Comm'n v. Cinderella Career & Finishing Schools, Inc.,** 404 F.2d at 1309-1310 with **Carlsberg v. Gatzek,** 442 F. Supp. at 818 n.2; see also, **Kukatash Mining Corp. v. Securities & Exchange Comm'n,** 309 F.2d at 653; **Relco, Inc. v. Consumer Product Safety Comm'n,** 391 F.Supp. at 846-847. Second, assuming due process violations, affected parties have little incentive to pursue judicial remedies in view of their inability to secure adequate relief. Although money damages are available to redress constitutional violations by Federal officials, see, **Bivens v. Six Unknown Named Agents,** 403 U.S. 388 (1971) (violation of Fourth Amendment); **Davis v. Passman,** 442 U.S. 228 (1979) (violation of due process clause of Fifth Amendment), Federal agencies are not answerable in money damages. **Relco, Inc. v. Consumer Products Safety Comm'n,** 391 F. Supp. 841, 846 n.9 (S.D. Tex. 1975) (money damages not available to compensate an individual whose due process rights were violated by agency release of publicity). **Cf., Carlson v. Green,** 446 U.S. 14, 19-20 (1980) (noting that 1974 amendment to Federal Tort Claims Act waived sovereign immunity of the United States for certain constitutional torts.[10] Third, since

---

[10] Neither can 42 U.S.C. § 1983, which supplies the basis for awarding damages for due process violations, **e.g., Carey v. Piphus,** 435

injunctive relief involves the balancing of harm to the public interest with harm to the target of the publicity, injunctions only issue to prevent the issuance of knowingly false statements. **Commonwealth v. Elm Medical Laboratories,** Mass. Appeals Ct. No. 80-0203-CV (issued July 22, 1980) (Kass, J.); **Federal Trade Comm'n v. Cinderella Career & Finishing Schools,** 404 F.2d at 1314 n.10; see, **id.** at 1320 (Robinson, J. concurring); see also, **Hoxsey Cancer Clinic v. Folsom,** 155 F. Supp. 376 (D.C.D.C. 1956). Fourth since the reported publicity cases preceded the 1975 **Goss v. Lopez** decision by the Supreme Court and other cases which held that due process may require some opportunity to be heard short of a full-blown trial-type proceeding, the parties may have felt pigeonholed into conceding that publicity need not be the subject of a trial-type hearing. See 2K. Davis sec. 13:4, at 484 (noting that in the pre-1970 legal system courts seldom considered the question of whether due process required less than a trial-type hearing). Compare, **Kukatash Mining Corp. v. Securities & Exchange Comm'n,** 309 F.2d at 650 (hearing not required prior to release of publicity) with **Ajay Nutrition Foods, Inc. v. Food & Drug Administration,** 378 F.Supp. at 217-218 (jurisdiction to consider claim that administrative agency's release of true information without hearing violates due process lies in the Court of Appeals).

The conclusion I draw from these cases is, therefore, not that due process principles do not apply, but rather, that in the reported cases, any violation of due process was not remedial in the form sought by the plaintiffs. Although not found in the cases, the proposition that due process requires some informal procedure before adverse publicity may issue receives support from commentators. **E.g.,** 2 K. Davis sec. 13:4, at 484-486 (arguing that due process principles require advance notice and some opportunity for an oral hearing

prior to informal agency action, such as publicity). Gellhorn, 86 Harv.L.Rev. at 1429 (unless the public "need" for an immediate announcement is substantial, the ideal procedure would be to postpone agency publicity which is likely to have a significant and adverse impact until the named respondent has had an opportunity for a hearing). J. Mashaw and R. Merrill, **The American Public Law System** at 383.[11]

### 4. G.L. c. 111D, sec 11—Common Law Basis for Due Process.

In addition to the commentators mentioned above, our own General Court has devoted considerable attention to the question of what process is due to clinical laboratory operators who face adverse agency action. Just as the enactment of G.L. c. 111D evinced a legislative intent to create a protected interest in favor of clinical laboratories, so does sec. 11 suggest the amount of process the Legislature felt was due clinical laboratories. Although not applicable by its terms due to the Department's failure to license clinical laboratories despite a five-year hiatus, the statute supplies a basis for expanding upon any common law due process rights which clinical laboratories possess. See, 1 K. Davis sec. 2:19, at 143-146, sec. 6:11, at 494-496; see also, Wilkins, **supra,** n.3 at 888. Under sec. 11, Elm would be free from the

U.S. 247 (1978), be utilized against Federal agencies or officials, since it requires that the official be acting under color of state law. It therefore excludes from liability Federal officials acting under color of their authority. **Wheeldin v. Wheeler,** 373 U.S. 647, 650 n.2 (1963); **District of Columbia v. Carter,** 409 U.S. 418, 424 = 425 (1973).

[11] In their administrative law casebook, Professors Mashaw and Merrill argue for searching inquiry into an agency's choice to proceed by disseminating publicity, stating:

Indeed, a court might also properly ask *whether an agency that is specifically authorized* to disseminate information should be allowed to use publicity as an alternative to other available enforcement techniques that afford the protection of formal proceedings. For if the legislature

imposition of any sanction unless the Department adhered to the strict procedures of that section. Although the term sanction is not defined in G.L. c. 111D, it is proper to adopt accepted lexical definitions of a statute's key terms in furtherance of readily perceived legislative goals. **Trustees of Boston University v. Board of Assessors of Brookline,** Mass. App. Ct. Adv. Sh. 287, 291. Sanction has been defined as "Any consideration, principle or influence, which impels to moral action or determines the moral judgment as valid". Webster's New Int'l Dictionary (2d unabr. ed. 1934). The use of publicity is certainly one means by which the agency can compel targets of the publicity to comply with the agency's determination of appropriate conduct. Although adverse publicity serves the purposes of informing and warning the public, whatever its primary purpose, it is clear that such publicity also operates as a sanction to varying degrees. See, Gellhorn, **Adverse Publicity by Administrative Agencies,** 86 Harv.L.Rev. 1380, 1382-1383 (1973) (noting the three nonexclusive functions of informing, warning and sanctioning). Professor Gellhorn also argues persuasively that adverse publicity constitutes a sanction within the meaning of the Administrative Procedure Act, 5 U.S.C. sec. 558(b). **Id.** at 1433 n. 213.

Given the application of G.L. c. 111D, sec. 11 by analogy, Elm surfaces with a large complement of procedural safeguards. Although arguably there exist certain situations in which the need for an immediate announcement is so substantial that due process requires no notice, the statute confers a right of advance notice complete with findings prior to the imposition of a sanction.

Utilizing the principles discussed here, I conclude that the Department's decision to release adverse publicity directed at Elm triggered Elm's due process rights, and that Elm may well have been entitled to advance notice complete with findings prior to any release of the publicity.[12]

## C. Allegations of Due Process Violations.

Fairly taken, the allegations contained in Elm's amended complaint suggest that the Department's releases of publicity in this case preceded any notice or opportunity for Elm to respond. These allegations withstand attack on a motion to dismiss.

## D. Applicability of Massachusetts Civil Rights Act to a Department of the Commonwealth.

The Department's strongest attack in this action has been addressed to its liability (or more directly, immunity) under both the Federal and state civil rights acts. The existence of both sovereign and official immunity often frustrates a plaintiff who has prevailed on the merits of the civil rights claim from ever obtaining damages. In determining whether the Commonwealth has consented to answer for damages, a court must look to the statute there, consent

is presumed to prefer the use of procedures which safeguard basic hearing rights, courts should not readily conclude that agencies have been empowered to employ the summary process of publicity when formal enforcement procedures are available. On this theory, the use of publicity as a sanction or its threat as a means of assuring "voluntary compliance" would require justification in terms both of the agency's statute and the necessity for protecting the public interest. J. Mashaw and R. Merrill, **The American Public Law System** at 383 (1975).

[12] The essential facts justifying the findings may also be required. **See Bachowski v. Brennan,** 421 U.S. 560 (1975); 3 K. Davis §§ 14:23, 14:26-14:27 (1980); **School Comm. of Chicopee v. Massachusetts Comm'n Against Discrimination,** 361 Mass. 352, 355 (1972). While written notice may be preferred, circumstances may make it impractical, allowing oral or telephone notice to suffice. The Department's decision to request that the Attorney General file a complaint, which launches the adjudicative process, does not, however, require advance notice. **See Federal Trade Comm'n v. Cinderella Career & Finishing Schools,** 404 F.2d at 1321-1322 n.45 (Robinson, J., concurring in the result).

to suit must be expressed by the terms of the statute itself or appear by necessary implication. **Woodbridge v. Worcester State Hospital** 1981 Mass. Adv. Sh. 1581, 1585. Of course, if the Commonwealth has consented to a civil rights action against the Department by enacting the Massachusetts Civil Rights Act in 1979, then the suit must proceed notwithstanding the "exclusive" remedy language of G.L. c. 258, sec. 2 in order to give effect to the legislative intent. "The General Court will not be understood to have enacted a nullity and the (Massachusetts Civil Rights Act) must be given a construction that will lead to a logical and sensible result." **Lexington v. Bedford,** 1979 Mass. Adv. Sh. 1909, 1918, quoting from **Bell v. Treasurer of Cambridge,** 310 Mass. 484, 489 (1941).

The Massachusetts Civil Rights Act appears drafted as a hybrid of several of the Federal Civil Rights Acts. See 42 U.S.C. secs. 1983, 1985, 1988. Although superficially based on 42 U.S.C. sec. 1983,[13] the Massachusetts Act additionally protects the exercise and enjoyment of rights secured by the constitution or laws of the Commonwealth and dispenses with the requirement that the offender act under color of state law. G.L. c. 12, sec. 11H. The Massachusetts Act imposes the additional requirement not found in 42 U.S.C. sec. 1983, that the offender interfere by threats, intimidation or coercion. Compare 42 U.S.C. sec. 1985. Finally, the Massachusetts Act adopts the Federal practice of awarding the prevailing party costs and reasonable attorney's fees, **compare** G.L. c. 12, sec. 11I **with** 42 U.S.C. sec. 1988,[14] although again, the Massachusetts Act, by entitling the prevailing party to attorney's fees, appears to have a broader application.

The Department's motion to dismiss is based on its view that the term "person" in the Massachusetts Act should be construed in the same way that the Supreme Court construes that term in sec.

1983.[15] While interpretations of a Federal statute which is similar to the state statute under consideration are often helpful in setting forth all the various policy considerations, such interpretations are not binding on a state court construing its own state statute. **Massachusetts Electric Co. v. Massachusetts Comm'n Against Discrimination,** 375 Mass. 160, 167 (1978).

Before discussing the Supreme Court's interpretation of the term "person", I shall note the possible interpretations which come to mind. First, "(i)t is a

---

[13] 42 U.S.C. § 1983 provides:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress.

[14] 42 U.S.C. § 1988 provides:
In any action or proceeding to enforce a provision of §§ 1977, 1978, 1979, 1980, and 1981 of the Revised Statutes (42 U.S.C. §§ 1981-1983, 1985, 1986), title IX of Public Law 92-318 (20 U.S.C. § 1681 **et seq.** (1976 ed.) ), or in any civil action or proceeding, by or on behalf of the United States of America, to enforce, or charging a violation of, a provision of the United States Internal Revenue Code (26. U.S.C. § 1 **et seq.** (1976 ed.) ), or title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d **et seq.**), the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

[15] The assertion that the Department's liability under G.L. c. 12, § 11I should parallel Federal immunity under 42 U.S.C. § 1983 is inapposite. Federal agencies are not sued under 42 U.S.C. § 1983 because that section imposes liability for actions "under color of state law". It therefore excludes Federal officials acting under color of their authority. **Wheeldin v. Wheeler,** 373 U.S. 647, 650 n.2 (1963); **District of Columbia v. Carter,** 409 U.S. 418, 424-425 (1973). **Compare Bivens v. Six Unknown Named Agents,** 403 U.S. 388 (1971) (Federal officials liable for damages for violation of Fourth Amendment) **with Kletschka v. Driver,** 411 F.2d 436, 448-449 (2d Cir. 1969) (Federal officials who conspire with state officials may be liable under 42 U.S.C. § 1983 if exercise of state power played "significant" role in the result).

widely accepted rule of statutory construction that general words in a statute such as 'person' will not ordinarily be construed to include the state or political subdivisions thereof." **Perez v. Boston Housing Authority**, 368 Mass. 333, 339 (1975). **Cf. Gallant v. Worcester,** Mass. Adv. Sh. (1981) 1310, 1317 n.8. Thus, the term could be construed to encompass conduct by private individuals, corporations, societies, associations, and partnerships. See G.L. c. 4, sec. 7, twenty-third. Second, in addition to the coverage under G.L. c. 4, sec. 7, the term could be construed to reach the conduct of state and local officials. Third, in addition to those noted in the preceding sentence, the term person could be construed to reach the conduct of the Commonwealth as well. Finally, the term person could be construed to reach only the Commonwealth, only subdivisions of the commonwealth (**e.g.,** municipalities), only state and local officials, or some combination of the three.

The United States Supreme Court currently construes the term person in sec. 1983 to subject state and local officials to suit, **e.g., Monroe v. Pape,** 365 U.S. 167, 184, 187 (1961), to subject subdivisions of the Commonwealth to suit, **Monell v. Department of Social Services,** 436 U.S. 658 (1978) (overruling **Monroe v. Pape,** 365 U.S. 167, 187 (1961) in part) (municipalities answerable in damages for constitutional violations grounded in official policies), and to immunize the state or a department of a state from suit. **Quern v. Jordan,** 440 U.S. 322 (1977) (state agency not answerable in damages for constitutional violations). **Woodbridge v. Worcester State Hospital,** Mass. Adv. Sh. (1981) at 1587-1588 n.7. The **Quern** decision also supports the proposition that a state agency is not a proper defendant for equitable relief under sec. 1983. **Cf. City of Kenosha v. Bruno,** 412 U.S. 507, 511-513 (1973).[16] Despite the unavailability of money

damages or injunctive relief against a department of the state, a party who prevails in a sec. 1983 action against state officials may obtain an award of costs and attorney's fees against the state or the state department. **Hutto v. Finney,** 437 U.S. 678, 699-700 (1978).[17] Thus, United 600 (1979) (term civil rights has commonly understood meaning); **Georgia v. Rachel,** 384 U.S. 780, 779-792 (1966). But see, **Maine v. Thiboutot,** 448 U.S. 1 (1980) (refusing to limit the application of the term "and laws" in 42 U.S.C. § 1983 to laws pertaining to civil rights); **Maher v. Gagne,** 448 U.S. 122 (1980). Although the Supreme Court in **Thiboutot** recognized the distinction between statutes providing for the protection of civil rights and other statutes, the Court

---

[16] In **Kenosha,** decided while the rule of **Monroe v. Pape** that municipalities are not answerable in damages under § 1983 was in force, the Court dismissed an action for an injunction brought pursuant to 42 U.S.C. § 1983. The Court refused to apply a bifurcated meaning to the word person depending on the nature of the relief sought, holding that municipalities are not persons under § 1983 no matter what relief is sought. **City of Kenosha v. Bruno,** 412 U.S. at 513. Although the holding of **Kenosha** can no longer be viable in light of **Monell,** its reasoning in refusing to give a bifurcated application to the term person would likely be followed.

[17] Some aspects of the **Hutto** decision are at odds with statements in **Quern v. Jordan,** 440 U.S. 332. For example, the Court of Appeals opinion makes clear that the attorney's fee award was based on successful prosecution of a § 1983 action. **Finney v. Hutto,** 548 F.2d 740, 742 (8th Cir. 1977). In awarding attorney's fees against the state, the Supreme Court noted that the Eleventh Amendment prevented the plaintiffs from suing the state by name. **Hutto v. Finney,** 437 U.S. at 699. The Court in **Quern** did not rest on the argument that the Eleventh Amendment stood as a bar to obtaining relief against states under § 1983, holding instead that the states were immune as a matter of Congressional intent. **Quern v. Jordan,** 440 U.S. at 340. Although recognizing that legislation passed pursuant to § 5 of the Fourteenth Amendment is not subject to the immunity conferred by the Eleventh Amendment, the court refused to override the states' traditional Eleventh Amendment immunity absent a clearly expressed intention to do so from Congress. **See Id.,** at 344 n.16.

nevertheless concluded that Congress did not intend to restrict the application of the term "and laws" in sec. 1983 to civil rights claims. **Maine v. Thiboutot,** 448 U.S. 1. While recognizing that the General Court dispensed with the requirement that a person act "under color of state law", I do not believe that the General Court intended the Act to apply to every intentional tort case involving threats, intimidation or coercion, which is brought in the commonwealth. Rather, I conclude that the General Court intended the Act to reach conduct by private individuals which deprives a person of rights secured by the Constitution or by a law comparable to the Federal Civil Rights Acts.

Having concluded that the Act reaches private conduct not subject to liability under 42 U.S.C. sec. 1983, I must now determine whether the General Court intended to reach official conduct as well. By its terms, the Act protects the exercise and enjoyment of rights secured "by the constitution or laws of the United States". G.L. c. 12, sec 11H. To the extent that the Act incorporates the protections of 42 U.S.C. sec. 1984, it extends generally to official conduct. See, **Adickes v. S.H. Kress & Co.,** 398 U.S. 144 (1970); see also, **Maine v. Thiboutot,** 448 U.S. 1 (1980). The Fourteenth Amendment, and those amendments applicable by incorporation "protect the individual against **state action,** not against wrongs done by **individuals**". **United States v. Guest,** 383 U.S. 745, 755 (1966). See, **Dombrowski v. Dowling,** 459 F.2d 190. 196 (7th Cir. 1972) (Stevens, J.) (no Fourteenth Amendment right to be free from private deprivation of equal protection). Although the Federal Constitution protects some rights from interference by private individuals, see, e.g., **Griffin v. Breckinridge,** 403 U.S. 88, 105-107 (1971) (identifying right to be free from badges and incidents of slavery and right to travel as protected from private

interference), most guarantees are States Supreme Court interpretations of 42 U.S.C. sec. 1983 construe the term person narrowly so as to exclude the state or a department of the state. This does not mean, however, that purely private conduct may be reached. Because sec. 1983 requires that the person act "under color of state law", only conduct of persons who have some connection with the state may be reached. See, **e.g., Adickes v. S. H. Kress & Co.,** 398 U.S. 144 (1970). By broadening the Act to encompass persons "whether or not acting under color of law" G.L. c. 12, sec. 11H, the General Court appears to reach purely private conduct. The question as to what kind of private conduct the General Court intended to reach remains.

Arguably, by creating a cause of action for damages for violation of any right secured by the constitution or laws of the Commonwealth, the General Court has created a separate cause of action for violation of any state law, including, for example, state tort law. The United States Supreme Court recently interpreted the term "and laws" in 42 U.S.C. sec. 1983 to encompass violation of any Federal law by a state official, whether or not the law related to civil rights. **Maine v. Thiboutot,** 448 U.S. 1 (1980). Although such an interpretation of G.L. c. 12, sec. 11I would appear superfluous, close reading of the entire statute finds such an interpretation a boon to successful plaintiffs, who now "shall be entitled to an award of the costs of the litigation and reasonable attorneys fees in an amount to be fixed by the Court." G.L. c. 12, sec. 11I. Such a radical departure from the accepted practice of awarding attorney's fees in four limited circumstances (the so-called American Rule) **see Bournewood Hospital, Inc. v. Mass. Comm'n Against Discrimination,** 371 Mass. 303, 307-313 (1976) should be thoughtfully considered.

In determining whether the General Court intended to reach all types of purely

private conduct, I look to the title of the Massachusetts Act for guidance. See, **Commonwealth v. School Committee of Springfield,** 1981 Mass. Adv. Sh. 502, 514 (title of statute entitled to weight in discerning its purpose). Entitled ''An Act for the Protection of the Civil Rights of Persons in the Commonwealth'', St. 1979, c. 801, the Act appears to address itself primarily to conduct which is proscribed by the constitution or laws which are comparable to the Federal Civil Rights Acts. See, **Chapman v. Houston Welfare Rights Organization,** 441 U.S. directed at interference by the state or its officials. Thus, by including a protection of the exercise and enjoyment of rights secured by the Constitution and laws of the United States, I conclude that the General Court intended to reach official conduct which interferes with the exercise and enjoyment of those rights.

There remains only the question of the Commonwealth's liability under the Act. After considering the language of the Act, the nature of the rights secured by it, the type of conduct against which the Act is directed and the interpretation given by the Supreme Court to cognate provisions of the Federal Civil Rights Acts, 42 U.S.C. secs. 1983, 1985, 1988, I conclude that the General Court intended G.L. c. 12, sec. 11I to apply, at a minimum, to the same extent as the Federal Civil Rights Act. See, **Massachusetts Electric Co. v. Massachusetts Comm'n Against Discrimination,** 375 Mass. at 167. I discern no legislative intent to limit the reach of the Act to purely private conduct, leaving official conduct untouched. **Cf. Perez v. Boston Housing Authority,** 368 Mass. at 339-340 (statute, which clearly defined housing authorities' responsibilities, contained disclaimer of liability by the Commonwealth, and appeared directed at purely private conduct, did not subject Commonwealth to suit under provision of sanitary code which allowed enforcement of the code against any ''person who . . . has

authority to rehabilitate . . . the premises''. By unqualifiedly incorporating the provisions of 42 U.S.C. sec. 1983 into its protective sphere, the Act by necessary implication abrogates sovereign immunity. See, **Woodbridge v. Worcester State Hospital,** 1981 Mass. Adv. Sh. 1581; see also, **Monell v. Department of Social Services,** 436 U.S. 658 (1978). Although I find it difficult to reconcile an interpretation of the word person which includes municipalities with an interpretation which excludes departments of the state, **compare Monell v. Department of Social Services,** 436 U.S. 658 (1978) **with Quern v. Jordan,** 440 U.S. 332 (1979), I find it unnecessary to attempt that reconciliation here. In the context of this litigation, I conclude that if Elm succeeds in establishing a violation of its constitutional due proces rights,[18] Elm is entitled to an award of the costs of the litigation and reasonable attorney's fees payable out of funds of the commonwealth. G.L. c. 12, sec. 11I. See, **Hutto v. Finney,** 437 U.S. 678 (1978); **Maher v. Gagne,** 448 U.S. 122 (1980). The issue of the Commonwealth's liability for actual damages need not be decided here.

For the reasons stated above, the Department's motion to dismiss is DENIED.

**William G. Young**
**Justice of the Superior Court**

---

[18] Since nominal damages are available for due process violations, **Carey v. Piphus,** 435 U.S. 247 (1978), Elm need not show damages in order to succeed on its claim.