**RELCO, INC. and Thomas H. Doss,
Plaintiffs,**

v.

**CONSUMER PRODUCT SAFETY COMMISSION et al., Defendants.**

**Civ. A. No. 74-H-362.**

United States District Court,
S. D. Texas,
Houston Division.

March 24, 1975.

James E. Knox and Morris E. Belilove, Houston, Tex., for plaintiffs.

Edward B. McDonough, Jr., U. S. Atty., and Helen M. Eversberg, Asst. U. S. Atty., Houston, Tex., for defendants.

## MEMORANDUM OPINION AND ORDER

NOEL, District Judge.

The facts essential to the disposition of the motion are not in dispute. Plain-

tiff. Thomas Doss, brought this action in his own behalf and in behalf of Relco, Inc., a corporation wholly owned by Doss, to permanently enjoin the Consumers Product Safety Commission (hereinafter called "the Commission" or "CPSC") from proceeding under or enforcing Sections 12(b)(1) and 15(a)(2), (b)(2), (c) and (d) with respect to plaintiffs' product, a low-cost electronic arc welder called the "Wel-Dex". In addition, plaintiffs request that a three-judge panel be convened pursuant to 28 U.S.C. § 2282 on the ground that portions of the Consumers Product Safety Act (hereinafter called "the Act") are unconstitutional. Defendants have filed a motion to dismiss the complaint for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted.

The Commission was created by Public Law 92–573, 15 U.S.C. § 2051, et seq. The purposes of the Commission are, among other things, to protect the public against unreasonable risks of injury and to assist consumers in evaluating the comparative safety of consumer products. 15 U.S.C. § 2051(b). The Commission receives and investigates numerous complaints from a variety of sources regarding consumer products.

In the instant case, on December 26, 1973, an electrical engineer employed by the General Services Administration, an agency of the United States government, complained to the Commission that the plaintiffs' product was unsafe. While the complainant had received no injury, he alleged that certain potential dangers inherent in the product's design warranted close inspection by the agency.

Motivated by this letter, the Commission began an investigation into the safety of the Wel-Dex arc welder. Through the Commission's Bureau of Engineering Sciences, an initial report was compiled on February 14, 1974. Following the internal procedure of the agency, the Commission notified the plaintiff Doss of the investigation. In-

formation on the Welder and its production history was requested. This information was immediately provided by plaintiff Doss. This data in general reflected that the welder had been manufactured by the Relco Corporation since 1968 under the trade name "Wel-Dex" at a price of $18.95. During the six years of its production, 200,000 units had been produced and distributed to customers nationwide with no known or reported injury or malfunction.

On February 21, 1974, after receipt of the above information, a meeting was held by the CPSC's Bureau of Compliance for the purpose of a coordinated follow-up investigation. At that meeting, the Deputy Director, Mr. Harry Garber, of the agency's Bureau of Compliance, relying upon the complaint and the internal technical evaluation conducted by CPSC technicians, ordered a national press release alerting the public to the potential hazards discovered within the plaintiffs' product. The Deputy Director, purportedly acting for the Commission, authorized the disclosure under the authority given to the Commission to protect the public from unsafe and imminently hazardous products.[1]

On the same afternoon, following the meeting of the Bureau of Compliance, plaintiff Doss was notified of the Bureau's decision. The following morning plaintiffs, through their attorneys, contacted the Commission to protest the issuance of any public disclosure until a hearing or an informal meeting could be arranged for plaintiffs to respond to the Commission's engineering findings and its conclusions. The Commission was assured that if they would withhold releasing the proposed press release, plaintiffs would retain Washington counsel and appear at the agency's offices at the beginning of business on the next working day. Despite these protests over the lack of an opportunity to be heard, the plaintiffs were informed that the deci-

---

1. The Consumer Product Safety Act, 15 U.S.C. § 2055(a)(1).

sion had been made and that the press release would be issued.

Accordingly, on the afternoon of February 22, 1974, the following press release was issued:

## "CPSC ALERTS CONSUMERS TO POTENTIAL HAZARD IN ELECTRIC ARC WELDER

"WASHINGTON, D. C. (Feb. 22)—
The U.S. Consumer Product Safety Commission today warned that approximately 200,000 'Wel-Dex' arc welders purchased by consumers over the past four to six years may contain defects capable of causing fatal electric shock.

"Consumers should immediately cease use of the product and take extreme care when disconnecting it from an electrical outlet.

"The terminals are exposed, creating a potential hazard of electric shock, and in addition poor connection of the line cord to the welder could render the entire outer frame electrically alive.

"The welders were manufactured by Wel-Dex Manufacturing Company, a subsidiary of Relco Industries, 2210 West 34th Street, Houston, Texas.

"Both the names of the welder and the manufacturer appear on a nameplate on the welder.

"The product was advertised through various media including organic gardening and farming magazines. All sales were by mail order.

"The Commission learned of the potential hazard as a result of a consumer complaint from an electrical engineer.

"The Commission is investigating alternatives open to it to insure that the product is corrected or removed from the market. Further information will be released to consumers as it is available."

Monday, February 25, 1974 (following the above press release), plaintiff Doss traveled to Washington, employed counsel there, and obtained an interview with officials in the agency. At that meeting, plaintiffs allege that the Commission demanded an immediate cessation of the distribution of the six-year-old product, and a recall or refund of all units previously sold. The plaintiff, upon these demands, consented to suspend production of the Wel-Dex "in its present form". No formal report of defects or engineering data sufficient to modify the product was presented by the Commission. However, a number of items were listed as being unsafe and in need of correction. On March 12, 1974 this suit was filed.

While the parties have raised many and varied contentions of liability and defense, the Court has distilled three primary issues. They are as follows:

(A) Does the Commission have the authority to delegate its power to waive the thirty-day notice requirement allowed by § 2055(b)(2)?

(B) Is the harm to plaintiffs so great and certain as to warrant preenforcement review instead of the initial judicially preferred method of utilizing the administrative adjudicatory process?

(C) Since the constitutional virtue of the Act has been questioned, must a three-judge court be impaneled?

A discussion of these issues follows.

## A. DELEGATION

Section 2055(b)(1) of the Act provides a general statutory scheme to be followed before any public disclosure is issued by the agency.[2] The section at-

---

2. "[N]ot less than 30 days prior to its public disclosure of any information obtained under this chapter, or to be disclosed to the public in connection therewith (*unless the Commission finds out that the public health and*

*safety requires a lesser period of notice*), the Commission shall, to the extent practicable, notify, and provide a summary of the information to, each manufacturer or private labeler . . . and shall provide such

tempts to balance the Commission's primary purpose of protecting the public from unsafe and dangerous products, with the fundamental fairness necessary to protect the manufacturer from administrative mistake and zealous oversight. The primary vehicle for this dictated balance is the statutory requirement that the Commission may take no action toward the release of any public disclosure until at least 30 days have passed since the manufacturer had been provided with a summary of the information relating to the scrutinized product. A reasonable opportunity must be provided within that period to allow the manufacturer to submit further information and to challenge such of the Commission's information as the manufacturer believes to be inaccurate. The Commission must further provide such procedural steps to insure its information is accurate and its publicity fair.[3] Where, however, the agency discovers a product on the market that is so imminently hazardous as to constitute an immediate threat to the "public health and safety", a public warning may be issued without any safeguard, notice, or delay.[4]

Plaintiffs do not contest the constitutionality of the notice provisions of the

Act, but challenge the legality of the agency subdelegation of that power and the manner in which the public health and safety exception was exercised. Plaintiffs contend that the overall Congressional purpose embodied in the Act reposes the responsibility for the disclosure of adverse publicity solely in the five Commissioners sitting as "the Commission",[5] and as such may not be delegated down to agency subordinates. See United States v. Giordano, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974).

■■■ It is not disputed that the agency, embodied by the five Commissioners, must of necessity delegate a large portion of the responsibility for administrative fact gathering and fact finding responsibility to its employees. However, some functions are so primary and so basic to the implementation of the statute as to be nondelegable. Functions constituting final agency action, such as administrative adjudications and rule making, must be made or ratified by the Commissioners and may not be delegated to subordinates under broad grants of authority.[6] Congress did not intend to provide the Commissioners with the right to effectively abdicate re-

manufacturer or private labeler with a reasonable opportunity to submit comments to the Commission in regard to such information. The Commission shall take reasonable steps to assure, prior to its public disclosure thereof, that information . . . is accurate, and that such disclosure is fair in the circumstances . . . ." (emphasis added).

3. *Id.*

4. Agencies are normally required to give notice of the disclosure and an opportunity for a hearing before entering a *formal administrative order* that adversely affects a private interest. Administrative Procedure Act, 5 U.S.C. §§ 554–557 (1970). Public warnings under the Act, however, are not final as the Act provides for a full hearing after the disclosure—if it is contested as being inaccurate or applied unlawfully. The public disclosure here is merely the first stage in the administrative inquiry. Plaintiffs have the right to challenge the notice and the Commission's preliminary determination that their product presents a substantial hazard to the public. As required by Title 15, Sec-

tion 2064(f), plaintiffs must be provided with a full adjudicatory hearing before any action, other than the public disclosure, is taken.

5. Subsection 3(a)(9), 15 U.S.C. § 2052(a)(9), states "The term 'Commission' means the Consumer Product Safety Commission, established by section 4."

Section 4(a), 15 U.S.C. § 2053(a), states "An independent regulatory commission is hereby established, to be known as the Consumer Product Safety Commission, consisting of five Commissioners . . . ."

6. On May 14, 1973, the Commission delegated to the Bureau of Compliance the power to assure that consumer products will be produced in conformity with product safety standards, by engaging in enforcement activities. CPSC Order 0130.1(q) May 14, 1973. The Commission contends this is authority to allow its Deputy Commissioner of the Bureau of Compliance to issue public warnings, and the power to invoke the public health and safety exception without approval or consent from the Commissioner.

sponsibility in any area. While intra-agency delegation is a necessity in carrying out some of its functions, such delegation cannot be excessive. As stated by Professor Davis:

> The single administrator, or the three or five or seven or eleven commissioners, are not provided with a staff of five hundred or a thousand and then expected to take all action without subdelegation. At the same time, the courts stand guard to prevent undue subdelegation to lowly subordinates who may act irresponsibly. The courts have often found judicial intervention desirable to protect against what has been thought to be excessive delegation. I Davis, Administrative Law Treatise, Sec. 9.01, (2nd ed., 1967).[7]

■■ In the instant case the public warning once issued carried with it finality in its most certain and practical sense. Plaintiffs' business is one wholly dependent upon media advertising. Once the government condemns a product as inherently dangerous and unfit, that denouncement may well be tantamount to an economic death knell.[8] Where a product is once shrouded with suspicion, especially suspicion cast upon it by the government, the harm is irretractable,[9] and no subsequent agency determination at a full hearing can fully lift the taint.[10]

■■ Compounding this problem is the fact that the Congressional cure is as lethal as the disease. Those consumers and hobbyists not reached by the first national release may well be driven away by the second. In the American market where product alternatives abound, it is short-sighted to view a public retraction as doing anything more than emphasizing the damage of the initial warning. Nevertheless, while the

7. "Only in a few cases have federal courts passed upon the question of subdelegation." 1 Davis, Administrative Law Treatise, § 9.-05, p. 630 (2d ed., 1967). These cases uniformly dealt with subdelegation of the subpoena power. Section 2076(b)(8) of the Act empowers the Commission to delegate any function or power, "other than the power to issue subpoenas".

8. For an excellent discussion on the effects of adverse information released by administrative agencies, see Gellhorn, Adverse Publicity by Administrative Agencies, 86 Harv. L.Rev. 1380 (1973).

9. The sole remedy for an inaccurate, excessive, or premature product censor is provided by Section 2055(b)(1). The section provides that upon a finding of a material inaccuracy in the public disclosure the Commission must, "in a manner similar to that in which such disclosure was made, publish a retraction of such inaccurate or misleading information." It should be noted that neither the government nor the administrator may be called upon to respond in damages. Government officials enjoy an absolute tort immunity for their abuses of discretion, even if malice is alleged. Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959); see generally, W. Prosser, Handbook of the Law of Torts §§ 111–16, 128 (4th ed., 1971) (defamation and injurious falsehood).

10. The FDA is one of the few agencies, other than the CPSC, granted specific statutory authority to issue adverse publicity. Like the CPSC the threat of publicity is one of the most potent persuaders. The power has not, however, been without controversy, error, and severe damage.

On November 9, 1959, Secretary of Health, Education and Welfare, Arthur Fleming, cautioned the public not to buy cranberries grown in two western states, saying they might be contaminated with aminotriazole, a chemical weed killer believed to cause cancer in rats. The FDA issued a national public warning, and as a result of that warning and the attendant publicity thereon, virtually the entire cranberry crop remained unsold and wasted. This warning was later found to be wholly unfounded and untrue. A human being "would have to eat 15,000 pounds of (contaminated) cranberries a day for many years" to sustain any ill effects. Hearings on Dep't of Agriculture Appropriations Before the House Subcomm. of the Comm. on Appropriations, 86th Congress, 2nd Session. See also N.Y. Times, Nov. 12, 1959, at 20, col. 5. As a result of this publicity and due to the lack of any real remedy therefor, Congress provided emergency loans to cranberry growers at market prices, at a price of approximately $9 million. Hearings, supra.

Court can commiserate with the practical position of the plaintiffs, they are provided a full hearing after the fact. While it may offer no real relief, there is no substantial federal question that the method is constitutionally permissible. Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). It is not a requirement of due process that administrative discretion be stayed until the courts pass upon its wisdom and prudence. Ewing v. Mytinger & Castleberry, Inc., 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950). The Act provides for the compilation of a factual record under the provisions of § 2064(c)(d). Judicial review may thereafter follow.

## B. PREENFORCEMENT REVIEW

The Act provides the right to a full adjudicatory hearing to all persons before any civil or criminal sanction can follow.[11] Plaintiffs contend that the Court should enjoin the Commission from taking any further action toward them. Preenforcement review is proper, it is argued, due to the agency's threat of future action and because of plaintiffs' complete inability to interpret the Act's requirements. As authority, plaintiffs · rely upon Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). In Abbott, the Commissioner of the Food and Drug Administration had promulgated an order requiring all labels, advertisements, and other printed matter relating to prescription drugs to designate the established name of the particular drug involved, each time its trade name was used anywhere in the material. The suit was brought in behalf of the Pharmaceutical Manufacturers' Association by thirty-seven individual drug manufacturers seeking a declaratory judgment and an injunction enjoining the enforcement · of the regulation on the ground that the Commissioner had exceeded his authority under the statute. 387 U.S. at 138–39, 87 S.Ct. 1507.

In hearing the attack upon the Commissioner's determination in *Abbott,* the Court did so only after · finding that the Commissioner's order constituted "final agency action" under Sec. 10 of the Administrative Procedure Act, 5 U.S.C. § 704. This was not a case in which the Court interjected itself into or before administrative hearings. Mr. Justice Harlan, speaking for the Court, carefully pointed to the longstanding reluctance of the Court to apply injunctive and declaratory relief to administrative determinations unless it was clear that the matter was ripe for judicial review.[12]

■ Plaintiffs here are not seeking to review any finally adjudicated determination or order, but are requesting an advisory opinion as to the Court's interpretation of the Congressional enactment and its effect, if any, upon plaintiffs and their product. This is a matter best left to the agency for its initial consideration at properly instituted administrative hearings. The Act, in and of itself, does not command or compel plaintiffs to take any action.[13] Nor can the Commission compel plaintiffs to act or refrain from acting until an adjudicatory hearing has been held.[14]

There has been neither an administrative hearing nor a final agency determination regarding plaintiffs and their product. The sole application of the Act to the plaintiffs has been the issuance of a public warning. While, as noted, this disclosure is final in its practical effect, the review of the warning must initially be brought before the agency and is not final at law until it is so brought.

---

11. 15 U.S.C. §§ 2069, 2070.

12. See 3 Davis, Administrative Law Treatise (1958), and Jaffe, Control of Administrative Action, (1965) for an elaboration on the judiciary's caution in refusing to decide administrative law matters not ripe for review.

13. See note 4, supra.

14. 15 U.S.C. § 2064(f) states, . . . "An order . . . may be issued only after an opportunity for a hearing" in accordance with the Administrative Procedure Act.

Plaintiffs' position is very similar to the one urged in Lion Mfg. Corp. v. Kennedy, 117 U.S.App.D.C. 367, 330 F. 2d 833 (1964). The plaintiff there sought a declaratory judgment and injunction prohibiting the enforcement of the Gambling Device Act of 1962 on the grounds that the definition of gambling device was overly broad and because of this breadth, the Act was impossible to follow. The Circuit Court dismissed the suit and plaintiffs' argument stating:

> We do not, thus, regard this complaint as creating a proper occasion for the invocation of judicial power. Its deficiencies in this regard result in a lack of jurisdiction in the District Court in an absolute sense and not merely in a discretion to withhold its exercise. There are no facts alleged which place plaintiffs in a truly adversary position vis-a-vis the defendant and under circumstances in which the judicial power can perform its traditional function of resolving an existing controversy between persons who have arrayed themselves in opposition to each other. *The nature of plaintiffs' business being what it is, it would, no doubt, be useful and of interest to them to have an authoritative advance legal opinion as to how the statute operates, or, indeed, whether it operates at all.* But it is not the business of courts to furnish such opinions outside the framework of the clashing interests and the concrete facts of a true lawsuit. There was none such here. 330 F.2d at 840 (emphasis added).[15]

It is now well settled "that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938).[16] A primary purpose of this policy is, of course, the avoidance of premature interruption of the administrative process. Where the agency is empowered with applying a statute in the first instance, its autonomy should be respected and not diluted with constant judicial interruption. It is this same respect that lies behind judicial rules sharply limiting interlocutory appeals.

Certain practical notions of judicial efficiency come into play as well. A plaintiff may be victorious in the administrative process and his complaint may well end there. If this is so, the court may never have to intervene. Likewise, the concept of comity requires that the agency be given the first opportunity to mend its ways if it has abused its discretion. Where Congress has prescribed certain administrative procedures, the general rule is that the courts will not intervene until those procedures have been first exhausted. Anniston Mfg. Co. v. Davis, 301 U.S. 337, 57 S.Ct. 816, 81 L.Ed. 1143 (1937).

## C. THREE–JUDGE COURT

Plaintiffs assert that this Court is without jurisdiction to pass upon the constitutionality of the questioned provisions of the Act in that the case is "required . . . to be heard and determined" by three judges under 28 U.S.C. §§ 2281 and 2284. The Court does not agree. The three-judge procedure is an extraordinary one, imposing a heavy burden on federal courts, with expenses and delay, "[It is a] procedure, designed for a specific class of cases,

---

15. For other cases with similar holdings, see Connecticut v. Massachusetts, 282 U.S. 660, 51 S.Ct. 286, 75 L.Ed. 602 (1931); Longshoreman's Union v. Boyd, 347 U.S. 222, 74 S.Ct. 447, 98 L.Ed. 650 (1954); Carter v. City of Fort Worth, 456 F.2d 572 (5th Cir. 1972).

16. See generally 3 Davis, Administrative Law Treatise, Sec. 20.01 et seq. (1958 ed., 1965 Supp.); Jaffe, Judicial Control of Administrative Action, pp. 424–458 (1965).

sharply defined (and which) should not be extended lightly." Oklahoma Gas & Elec. Co. v. Oklahoma Packing Co., 292 U.S. 386, 54 S.Ct. 732, 78 L.Ed. 1318 (1934). The courts in construing the Three-Judge Court Act have repeatedly stressed that procedure is "not [as] a measure of broad social policy to be construed with great liberality." Phillips v. United States, 312 U.S. 246, 251, 61 S. Ct. 480, 483, 85 L.Ed. 800 (1940).[17]

■■■■■ No final administrative determination has been made toward plaintiffs. The substantive statutes complained of have yet to be applied to them or their case heard. The three-judge court procedure is not to be invoked on a conditional constitutional question. Copeland v. Secretary of State, 226 F. Supp. 20 (D.C., S.D.N.Y.1964), vacated and remanded on other grounds, 378 U. S. 588, 84 S.Ct. 1931, 12 L.Ed.2d 1041; International Ladies Garment Workers Union v. Donnelly, 304 U.S. 243, 58 S.Ct. 875, 82 L.Ed. 1316 (1938). Questions of constitutionality should not be decided at all unless such adjudication is unavoidable. Rosenberg v. Fleuti, 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1962). Therefore, where the plaintiffs have yet availed themselves to the administrative procedures afforded them, and have not been compelled to take any action or refrain therefrom, a single judge alone may refuse to hear the constitutional attacks and may dismiss for failure to exhaust and lack of justiciability. Gonzalez v. Automatic Employees Credit Union, 419 U.S. 90, 95 S.Ct. 289, 42 L.Ed.2d 249 (1974).

## D. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss must be granted and this cause dismissed, to accomplish which a separate order of dismissal has been prepared and signed.

17. See also Kesler v. Department of Public Safety, 369 U.S. 153, 82 S.Ct. 807, 7 L.Ed.2d 641 (1961); Allen v. State Board of Elec-

tions, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1968).