United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued October 1, 1998 Decided December 11, 1998 

 No. 97-1384

 Association of American Railroads and 

 Wisconsin Central Ltd.,

 Petitioners

 v.

 Surface Transportation Board and 

 United States of America, 

 Respondents

 Transportation Trades Department, AFL-CIO, et al., 

 Intervenors

 Consolidated with 

 No. 97-1397

 On Petition for Review of an Order of 
 the Surface Transportation Board

 ---------

 Thomas J. Litwiler argued the cause for petitioners. With 
him on the joint briefs were Robert H. Wheeler and Kenneth 
P. Kolson.

 Henri F. Rush, General Counsel, Surface Transportation 
Board, argued the cause for respondents. With him on the 
joint brief were Joel I. Klein, Assistant Attorney General, 
U.S. Department of Justice, John J. Powers, III, and Robert 
J. Wiggers, Attorneys; and Louis Mackall, V, Attorney, 
Surface Transportation Board.

 Mitchell M. Kraus, Lawrence I. Willis and Clinton J. 
Miller, III were on the joint brief for intervenors Transporta-
tion Trades Department, AFL-CIO, and United Transporta-
tion Union.

 Before: Wald, Sentelle and Tatel, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Tatel. 

 Separate opinion dissenting from Part II filed by Circuit 
Judge Wald.

 Separate opinion concurring in Parts I, II and IV and 
dissenting from Part III filed by Circuit Judge Sentelle.

 Tatel, Circuit Judge: Petitioners challenge the Surface 
Transportation Board's initial implementation of the ICC 
Termination Act's labor protection provisions for employees 
affected by short-line rail acquisitions. Agreeing with peti-
tioners, we hold that the Board's order extending "severance 
pay" not just to employees who lose their jobs, but also to 
employees displaced to lower-paying jobs, violates the statute. 
We agree with the Board that its method of calculating 
severance payment offsets represents a reasonable interpre-
tation of an ambiguous statutory term, and that it has author-
ity under Circuit precedent to require mandatory arbitration 
of labor protection disputes.


 I

 In 1995, Congress abolished the Interstate Commerce 
Commission and replaced it with the Surface Transportation 
Board. See ICC Termination Act of 1995, Pub. L. No. 
104-88, 109 Stat. 803 (1995) (codified at 49 U.S.C.A. s 10101 
et seq. (1997)). Congress strictly confined the new agency's 
authority to impose labor protection conditions on Class II 
(mid-size) railroads involved in short-line rail acquisitions. 
See 49 U.S.C.A. s 10902 (1997)). Under the prior statutory 
scheme, the ICC had authority to require railroads seeking 
expedited agency approval of rail line acquisitions to provide 
"a fair and equitable arrangement to protect the interests of 
the railroad employees affected." Railroad Revitalization and 
Regulatory Reform Act, Pub. L. No. 94-210, sec. 402(a), 
s 5(2)(f), 90 Stat. 31, 62 (1976) (amending Interstate Com-
merce Act). Pursuant to this authority, the ICC developed a 
standard basket of labor protection requirements known as 
the New York Dock conditions. These requirements included 
up to six years of income protection for terminated or dis-
placed rail employees, training and relocation allowances, 
advance notice to labor unions, and mandatory arbitration. 
See New York Dock Ry.-Control-Brooklyn Eastern Dist. 
Terminal, 360 I.C.C. 60, aff'd sub nom. New York Dock Ry. v. 
United States, 609 F.2d 83 (2d Cir. 1979). The ICC Termi-
nation Act specifies certain mandatory labor protection condi-
tions, but expressly deprives the new Board of discretion to 
impose other labor protection conditions. See 49 U.S.C.A. 
s 10902(c) (the Board "may require compliance with condi-
tions (other than labor protection conditions) the Board finds 
necessary in the public interest"). The labor protections 
mandated for mid-size railroads are as follows:

 The Board shall require any Class II rail carrier which 
 receives [expedited approval of a rail line acquisition] to 
 provide a fair and equitable arrangement for the protec-
 tion of the interests of employees who may be affected 
 thereby. The arrangement shall consist exclusively of 
 one year of severance pay, which shall not exceed the 


 amount of earnings from railroad employment of the 
 employee during the 12-month period immediately pre-
 ceding the date on which the application for such certifi-
 cate is filed with the Board. The amount of such sever-
 ance pay shall be reduced by the amount of earnings 
 from railroad employment of the employee with the 
 acquiring carrier during the 12-month period immediate-
 ly following the effective date of the transaction.... 

Id. s 10902(d).

 In the first proceedings under new section 10902(d), peti-
tioner Wisconsin Central (a Class II railroad) sought expedit-
ed Board approval of its acquisition of two short rail lines 
from Union Pacific. Running for 17.8 miles, the lines provide 
local service between Hayward Junction and Hayward, Wis-
consin, and terminal service in the pocket between Wausau 
and Schofield. To comply with section 10902(d)'s mandatory 
labor protection requirement, Wisconsin Central proposed 
making severance payments to each of the nine rail employ-
ees who would lose their jobs with Union Pacific in amounts 
equal to their railroad earnings during the previous twelve 
months. Severed employees rehired by Wisconsin Central 
would, as authorized by section 10902(d)'s offset provision, 
have their severance pay reduced each month by their Wis-
consin Central earnings. See Wisconsin Central Ltd.- 
Acquisition Exemption-Lines of Union Pacific R.R. Co., 
Finance Docket No. 33116, at 2 (STB Nov. 15, 1996), avail-
able in 1996 WL 681474.

 Announcing that "[t]he labor protective arrangement that 
results from this proceeding may be used as a model for 
conditions we impose governing the minimum labor protective 
arrangements we require with respect to acquisitions by 
Class II railroads," the Board sought public comment on 
"whether [Wisconsin Central's] proposed arrangement meets 
the statutory requirements, and on whether and to what 
extent we should establish and/or oversee the procedural 
aspects of labor protective arrangements under this statute." 
Id. at 1. The Transportation Trades Department of the 
AFL-CIO ("TTD") urged the Board to define "affected" 


employees broadly to include displaced as well as terminated 
employees, to calculate the offset on the basis of the number 
of hours worked during the previous twelve months, to im-
pose a 90-day notice requirement before consummation of 
proposed line acquisitions, and to require arbitration of dis-
putes. See Wisconsin Central Ltd.-Acquisition Exemption-
Lines of Union Pacific R.R. Co., Finance Docket No. 33116, 
at 3 (STB Apr. 16, 1997), available in 1997 WL 186804. 
Petitioners Wisconsin Central and the Association of Ameri-
can Railroads submitted comments arguing that the ICC 
Termination Act limits the Board's oversight role to assuring 
compliance with the statute's straightforward one-year sever-
ance pay requirement for employees who lose their jobs with 
the selling rail carrier, that it authorizes no protection for 
displaced employees, and that it deprives the Board of au-
thority to impose additional "procedural" labor protection 
requirements, including arbitration. See id. at 2-3.

 The Board adopted virtually all of TTD's proposals. First, 
it "agree[d] with TTD that affected employees should be 
defined not only as including employees losing positions with 
the selling carrier, but also to cover those employees who, in 
order to continue working on the selling carrier, must exer-
cise seniority and employees of the selling carrier who are 
adversely affected by those other workers' exercise of seniori-
ty." Id. at 5 (emphasis added). In other words, the Board 
extended labor protection to employees forced by an acquisi-
tion to transfer to different--and presumably lower-paying--
jobs elsewhere on the selling carrier. Second, the Board 
adopted TTD's suggestion that "the employee's earnings 
should be based on the same number of hours worked during 
each comparable month before and after the transaction." 
Id. at 5 & n.7. Finally, it required arbitration of disputes, 
permitting appeal pursuant to the substantially deferential 
Lace Curtain standard, under which the Board reviews recur-
ring or otherwise significant issues of general importance and 
reverses an arbitrator's decision only for egregious error. 
See id. at 5-6 (citing Chicago & North Western Transp. Co.-
Abandonment-Near Dubuque & Oelwein, Ia., 3 I.C.C.2d 729 


(1987) (Lace Curtain), aff'd sub nom. International Bhd. of 
Elec. Workers v. ICC, 862 F.2d 330 (D.C. Cir. 1988)).

 Subject to these conditions, the Board approved Wisconsin 
Central's acquisition of Union Pacific's rail lines. With re-
spect to TTD's suggestion for an advance notice requirement, 
the Board noted that Wisconsin Central had already satisfied 
any such requirement and postponed the issue for another 
proceeding, eventually imposing a 60-day notice requirement. 
See Acquisition of Rail Lines Under 49 U.S.C. 10901 and 
10902-Advance Notice of Proposed Transactions, Ex Parte 
No. 562 (STB Sept. 2, 1997), available in 1997 WL 555638. 
We sustained that requirement in Association of American 
Railroads v. STB, No. 97-1624, 1998 WL 791857 (D.C. Cir. 
Nov. 17, 1998).

 Wisconsin Central and the American Association of Rail-
roads now petition for review, challenging each element of the 
labor protection conditions the Board imposed on Wisconsin 
Central's proposed line acquisition. Specifically, they argue 
that the extension of severance pay to displaced employees, 
the calculation of earnings based on time worked, and the 
arbitration requirement run counter to the plain meaning of 
section 10902(d). Taking up each argument in turn, we 
review the Board's interpretation of the ICC Termination Act 
under Chevron's two-step analysis. See Chevron U.S.A. v. 
National Resources Defense Council, 467 U.S. 837 (1984). 
We ask first "whether Congress has directly spoken to the 
precise question at issue. If the intent of Congress is clear, 
that is the end of the matter; for the court, as well as the 
agency, must give effect to the unambiguously expressed 
intent of Congress." Id. at 842-43. But "if the statute is 
silent or ambiguous with respect to the specific issue, the 
question for the court is whether the agency's answer is 
based on a permissible construction of the statute." Id. at 
843.

 II

 We begin with petitioners' challenge to the Board's inclu-
sion of displaced employees within section 10902(d)'s "sever-

ance pay" requirement for "affected" employees. In defense 
of its position, the Board relies on section 10902(d)'s require-
ment of "a fair and equitable arrangement for the protection 
of the interests of employees who may be affected" by line 
sales. According to the Board, the class of employees "affect-
ed" by line sales includes, but is not limited to, employees 
whose employment relationship is severed; displaced employ-
ees are also "affected" by line sales. The Board reads section 
10902(d)'s second sentence--"[t]he arrangement shall consist 
exclusively of one year of severance pay"--not as a limitation 
on the class of employees protected by the Act (as petitioners 
urge), but rather as a limit on the amount of compensation 
that "affected" employees may receive. In other words, all 
affected employees, whether severed or displaced, must re-
ceive one year of severance pay.

 We cannot square the Board's position with the statute's 
plain language. To begin with, section 10902(d)'s use of the 
term "severance pay" indicates that Congress intended to 
limit the class of covered employees to those whose employ-
ment with the selling carrier was terminated as a result of a 
transaction. Webster's defines "severance pay" as "an allow-
ance usu[ally] based on length of service that is payable to an 
employee on severance." Webster's Third New Internation-
al Dictionary (1993). "Severance" means the "termination of 
a contractual association (as employment)." Id.; see also 
Black's Law Dictionary (6th ed. 1990) (defining severance pay 
as "[p]ayment by an employer to employee beyond his wages 
on termination of his employment"). Making clear Con-
gress's understanding that the "arrangement" applies to sev-
ered employees, the conference report describes section 
10902(d)'s arrangement as: "Class II rail carriers acquiring a 
line under this section are subject to a mandatory 1 year 
severance pay requirement for severed employees...." See 
H.R. Conf. Rep. No. 104-422, at 180 (1995) (emphasis added), 
reprinted in 1995 U.S.C.C.A.N. 850, 865 ("Conference Re-
port"). During floor debate, moreover, several members 
described the arrangement now contained in section 10902(d) 
as providing one year of severance pay for severed employees. 
See, e.g., 141 Cong. Rec. H12,301 col. 2 (daily ed. Nov. 14, 


1995) (Rep. DeFazio) (explaining the provision as "one [year] 
of severance for the employees who lose their jobs"); id. at 
H12,302 col. 1 (Rep. Rayhall) (characterizing the provision as 
a "dramatically reduced 1 year of severance pay, when the 
employee is eligible, in the event he or she loses a job as a 
result of a merger or other transaction of that nature"); id. at 
H12,303 col.1 (Rep. Johnson) (describing the provision as 
providing that "[e]mployees who lose their jobs get a 1 year 
severance").

 Not only does the use of the term "severance pay" demon-
strate Congress's intention to apply the "arrangement" to 
severed employees, but section 10902(d)'s limiting language 
and structure make it equally clear that Congress left no 
room for the Board to extend benefits to other employees. 
Mirroring the first sentence's requirement of "a fair and 
equitable arrangement for the protection of the interests of 
employees who may be affected," section 10902(d)'s second 
sentence provides quite specifically that "[t]he arrangement 
shall consist exclusively of one year of severance pay." Be-
cause section 10902(d) defines the arrangement for the pro-
tection of affected employees as consisting exclusively of one 
year of severance pay, and because severance pay is paid only 
to employees who actually lose their jobs, the Board has no 
authority to extend severance pay to displaced employees. 
Confirming this interpretation, section 10902(d)'s third sen-
tence requires that "[t]he amount of such severance pay shall 
be reduced by the amount of the earnings from railroad 
employment of the employee with the acquiring carrier." 
The only employees who could possibly have "earnings ... 
with the acquiring carrier" are employees who lose their jobs 
on the selling carrier as a result of the line sale and then take 
jobs on the acquiring carrier.

 The legislative evolution of section 10902(d) also confirms 
that Congress intended to limit protection to severed employ-
ees. The Interstate Commerce Act, as amended in 1940, 
contained only the first sentence of what has now become 
section 10902(d)--"[T]he Commission shall require a fair and 
equitable arrangement to protect the interests of the railroad 


employees affected." Transportation Act of 1940, ch. 722, 
sec. 7, s 5(2)(f), 54 Stat. 899, 906 (1940) (amending Interstate 
Commerce Act). It was on the basis of this language that the 
ICC developed the extensive New York Dock protections, 
which covered both severed and displaced employees. See 
New York Dock Ry., 609 F.2d at 87-90. As originally intro-
duced in Congress, the ICC Termination Act eliminated all 
substantive labor protections. See H.R. 2539, 104th Cong., 
141 Cong. Rec. H12,266-96. Concerned about "employees 
who lose their jobs because of a merger," members who 
favored labor protection focused on the harm caused by 
layoffs and the loss of jobs, and urged a compromise that 
would "leave the essential employee protections in place." 
141 Cong. Rec. H12,258 col.1 (statement of Rep. Vento) 
(emphasis added); see also, e.g., id. at 12,260 col.1 (statement 
of Rep. Oberstar) (urging protection for "railworkers ... 
[who] lose their jobs due to mergers and line sales"). Al-
though Congress eventually incorporated the Interstate Com-
merce Act's "fair and equitable arrangement" language into 
the final bill, it added the requirement that "the arrangement 
shall consist exclusively of one year of severance pay." See 
Conference Report at 179-80. The addition of the words 
"shall consist exclusively of" to the previous Act's "fair and 
equitable arrangement" shows that Congress intended to 
deprive the new Board of authority to impose New York 
Dock-style conditions for the benefit of displaced employees.

 We also think it significant that to accommodate its inter-
pretation of the statute, the Board found it necessary not just 
to ignore the Act's plain language, but to change it. The 
Board realized that extending section 10902(d)'s offset provi-
sion to displaced employees could "create the anomaly where 
an affected employee electing not to work for WCL, but 
remaining with UP, would double his previous year's income." 
Wisconsin Central Ltd.-Acquisition Exemption-Lines of Un-
ion Pacific R.R. Co., supra, at 5. The Board therefore ruled 
that the severance payment offset applies to "earnings from 
the employee's railroad employment" irrespective of whether 
the selling or acquiring railroad is the employer. In other 
words, the Board rewrote the statute to read: "The amount 


of such severance pay shall be reduced by the amount of the 
earnings from railroad employment of the employee with the
acquiring carrier during the 12-month period immediately 
following the effective date of the transaction...."

 Judge Wald argues that interpreting section 10902(d) to 
exclude displaced employees "doesn't make sense." Dissent-
ing Op. at 5 (Wald, J.). Although she (and the Board) may be 
correct that displaced employees deserve protection, Con-
gress could just as sensibly have decided to limit benefits only 
to employees whose employment with the selling carrier is 
actually terminated. Indeed, we recently rejected an agen-
cy's attempt to redraft a statute in order to avoid what the 
agency characterized as the "absurd results" that would flow 
from the statute's language because we found it "not incon-
ceivable that Congress meant what the statute says." See 
Mova Pharm. Corp. v. Shalala, 140 F.3d 1060, 1072 (D.C. Cir. 
1998).

 Finding Congress's intent clear from the statute's lan-
guage, structure, and legislative history, we have no need to 
proceed, as the Board urges, to Chevron's second step.

 III

 Petitioners next challenge the Board's interpretation of 
section 10902(d)'s requirement that severance pay shall be 
"reduced by the amount of earnings from railroad employ-
ment of the employee with the acquiring carrier during the 
12-month period immediately following the effective date of 
the transaction." According to petitioners, calculating "the 
amount of earnings" is mechanical and self-executing, leaving 
no room for Board interpretation; employees' severance pay-
ments must be reduced by their one-year aggregate earnings 
on the acquiring carrier. Finding the term "earnings" ambig-
uous, the Board interprets the offset provision in a way that 
matches earnings in the year following the line sale to earn-
ings in the prior year based on the number of hours worked. 
Earnings from the acquiring carrier that are attributable to 
hours worked in excess of hours worked in the previous year 


are in effect considered extra earnings and excluded from the 
offset calculation.

 The Board adopted this proposal in response to TTD's 
suggestion that "the monthly comparison [should be] 'apples 
to apples'; i.e., the comparison [should be] made for the same 
number of hours worked in a month so that the employee who 
works at a position at a lower hourly rate for more hours does 
not lose protective benefits and reduce the carrier's obli-
gations by working more hours for less pay." See Comments 
of TTD, Wisconsin Central Ltd.--Acquisition Exemption--
Lines of Union Pacific R.R. Co., Finance Docket No. 33116, 
at 14-15 (filed with STB Jan. 15, 1997). TTD illustrated its 
point with the following example: If a severed employee 
earned $2,500 monthly for 160 hours of work with the selling 
carrier and then earns $2,500 monthly for 320 hours of work 
with the acquiring carrier, the employee would be entitled to 
a monthly severance payment of $1,250 under the Board's 
"apples to apples" approach but would receive no benefits 
under petitioners' interpretation.

 This issue is quite different from the Board's extension of 
severance benefits to displaced employees, where Congress's 
use of the term "exclusively," together with the statute's 
structure and legislative history, demonstrated that the 
Board had exceeded its statutory authority. See supra at 6-
10. In contrast, Congress has not "directly spoken" to the 
question of precisely how the earnings offset should be calcu-
lated. Although section 10902(d) limits the offset to the 12-
month period following the transaction, the statute contains 
no definition of "earnings." Are "earnings" based on gross 
earnings or net earnings? Are overtime earnings "earnings"? 
How do payroll deductions for health insurance and employer 
contributions to pension benefits count in the employee's 
"earnings"? Neither legislative history nor any other tool of 
statutory construction aids us in ascertaining Congress's in-
tent with respect to the measurement of earnings under this 
statute.

 Had Congress intended to limit the term earnings in the 
way that petitioners and Judge Sentelle read it, it could have 


used the words "full" or "total" prior to "earnings." As 
Congress demonstrated in section 10902(d)'s second sentence, 
where it used the words "[t]he arrangement shall consist 
exclusively of one year of severance pay," it knows how to 
limit the Board's authority to interpret statutory language. 
Although Congress knew of the ICC's practice of calculating 
earnings offsets based on comparable hours worked, it left 
"earnings" unmodified in the new statutory scheme. We 
therefore read section 10902(d) as a "legislative delegation to 
[the] agency" to elucidate the statute's earnings offset provi-
sion. Chevron, 467 U.S. at 844.

 Moving to Chevron's second step, we cannot say that the 
Board's "apples to apples" approach represents an impermis-
sible construction of the offset requirement. The Board 
crafted its interpretation of earnings to respond to a practical 
problem identified by TTD--that acquiring carriers paying 
lower wages could avoid making severance payments by 
simply requiring employees to work more hours than they 
had in the previous year. TTD argued that this adverse 
incentive could potentially "destroy the effectiveness of the 
protection imposed by Congress" and "lead to abuse by 
employers and dangerous situations for tired employees." 
Intervenor-Respondents' Br. at 17, 18. Whether this 
amounts to a serious problem or whether the Board has 
fashioned the best solution is for the Board to decide, not us. 
Our deference to an agency's reasonable interpretation of its 
governing statute "is a product both of an awareness of the 
practical expertise which an agency normally develops, and of 
a willingness to accord some measure of flexibility to such an 
agency as it encounters new and unforeseen problems over 
time." International Bhd. of Teamsters v. Daniel, 439 U.S. 
551, 566 n.20 (1979). And unlike the Board's extension of the 
severance pay arrangement to displaced employees, which 
compelled it to disregard explicit statutory language to ac-
commodate its interpretation, here the Board ignores no 
words in the statute, but merely interprets the term "earn-
ings."


 IV

 Petitioners next claim that the Board unlawfully delegated 
resolution of disputes arising under section 10902(d) to pri-
vate arbitrators. According to petitioners, because the stat-
ute nowhere authorizes arbitration, the Board cannot require 
it.

 Circuit precedent forecloses petitioners' argument. In 
Brotherhood of Locomotive Engineers v. ICC, we considered 
a similar argument (in that case advanced by the labor union) 
that "the Commission, by submitting the labor disputes to 
arbitration ... failed to exercise its 'primary jurisdiction' in 
accordance with [the section requiring the Commission to 
impose labor protective conditions]." 808 F.2d 1570, 1579 
n.75 (D.C. Cir. 1987). Holding that "[a]rbitration is a legiti-
mate method of resolving labor disputes and does not divest 
the Commission of its jurisdiction," we declined to "mandate 
that the Commission adjudicate disputes that it properly 
determines to be arbitrable." Id. We reached a similar 
result in International Brotherhood of Electrical Workers v. 
ICC, supra. Observing that "[n]othing in the Act either 
requires or forecloses the agency's use of arbitration in 
employee disputes," we concluded that "[t]he ICC acted 
within its sound discretion in electing to use arbitration; had 
it not done so, all disputes over employee protective condi-
tions would have remained solely within the primary jurisdic-
tion of the agency." 862 F.2d at 336. Because the ICC 
Termination Act makes no change with respect to the Board's 
inherent authority to require arbitration, IBEW and Brother-
hood of Locomotive Engineers control here.

 V

 We grant the petition for review and hold that the Board's 
order requiring compensation of displaced employees violates 
section 10902(d) of the ICC Termination Act. We sustain the 
Board's interpretation of earnings based on comparable hours 
worked and its requirement of mandatory arbitration as 
permissible constructions of the statute.

 So ordered.

 Wald, Circuit Judge, dissenting from Part II: I disagree 
with the panel that the statutory provision for severance pay 
for rail workers who lose their jobs as a result of short-line 
acquisitions under section 10902(d) is unambiguously limited 
to workers who after the acquisition will no longer work for 
the selling railroad. In my view, the text of the relevant 
provision is decidedly ambiguous, the legislative history sheds 
no appreciable additional light on its meaning, and I would 
therefore proceed to a Chevron step two analysis, which 
defers to the Surface Transportation Board's ("the Board") 
reasonable determination that all employees who lose their 
jobs as a result of a short-line acquisition--including those 
who go on to other less well-paying employment with the 
selling carrier--are entitled to some amount of severance pay.

 The ICC Termination Act first authorizes the Board to 
require a covered rail carrier to "provide a fair and equitable 
arrangement for the protection of the interests of employees 
who may be affected" when one Class II railroad buys a short 
line from any other railroad. 49 U.S.C. s 10902(d). The next 
sentence goes on to define the meaning of that "arrange-
ment": "The arrangement shall consist exclusively of one 
year of severance pay...." Id. Thus, the second sentence 
tells the Board what the arrangement is but does not delimit 
who is entitled to receive it. The Board is left to decipher 
which "employees [ ] may be affected thereby."

 Under the ruling of Chevron U.S.A. Inc. v. Natural Re-
sources Defense Council, Inc., 467 U.S. 837 (1984), the panel 
finds that Congress has unequivocally made its intention clear 
that only employees of a short line who leave the employment 
of the seller of that line altogether are eligible for severance 
pay. It reasons that since "severance pay" is the only 
available remedy for "employees who may be affected" by an 
acquisition, it must follow that only "severed employees" are 
eligible for "severance pay." This of course is essentially a 
tautology. The panel then elaborates a bit by quoting a 
dictionary definition that defines "severance" as "termination 
of a contractual association (as employment)," see Majority 
Opinion ("Maj. Op.") at 7. Building on this somewhat scraw-
ny framework, the panel extrapolates that a "severed employ-


ee" can only be one terminated from his employment relation-
ship with the particular employer who used to own the short 
line and cannot mean someone who has been severed from his 
former job but still works for the former owner of the short 
line. Yet nothing in the statute's text, its history, or even the 
dictionary definition of severance pay suggests that limitation.

 Rather, "severance pay"--certainly in the context of this 
statute--is an ambiguous term not confined to employees 
"whose employment with the selling carrier was terminated 
as a result of a transaction." Maj. Op. at 7. The ICC 
Termination Act, as originally introduced in the House, elimi-
nated all labor protective conditions, known as New York 
Dock conditions, traditionally imposed by the ICC in mergers 
and line acquisitions. A compromise struck on the floor of 
the House of Representatives between those who favored 
some labor protection and those who opposed it resulted in 
adoption of the Whitfield Amendment, which we now con-
strue. There was no indication in the floor debate preceding 
the amendment's passage that lawmakers had achieved any 
meeting of the minds as to what exactly "severance pay" 
encompassed. Instead, the entire discussion addressed the 
compromise in terms of the shortening of the post-acquisition 
period during which salary protection was available, from six 
years under New York Dock, to one year under the amend-
ment. See 141 Cong. Rec. H12,297-306 (daily ed. Nov. 14, 
1995). The issue of just who qualified as an "employee 
affected" so as to merit "severance pay" was never directly 
confronted.

 The panel's restrictive definition of the term "severance 
pay" had never been employed as a term of art by the ICC, 
nor was it a definition unequivocally embraced by members of 
Congress who debated the amendment. Under the New 
York Dock regime, an acquiring railroad was required to 
make two types of allowances--"displacement allowances" 
and "dismissal allowances." The former allowance was for 
employees who were placed in worse positions with respect to 
their compensation as a result of a rail transaction, regardless 
of whom they worked for after the transaction; the latter was 
for employees who lost their jobs entirely because of a 


transaction. See New York Dock Ry.-Control-Brooklyn 
Eastern Dist. Terminal, 360 I.C.C. 60 app. III (Feb. 9, 1979). 
The term "severance pay" was often used by the ICC and 
reviewing courts to describe the combination of these two 
allowances. See, e.g., Santa Fe Pacific Corp.-Control-South-
ern Pacific Transp. Co., Finance Docket No. 30400 (Sub-No. 
21) (I.C.C. June 12, 1992), available in 1992 ICC Lexis 114; 
Indiana R.R. Co.-Merger, 6 I.C.C. 969 (1990); see also 
Railway Labor Exeuctives Ass'n v. ICC, 999 F.2d 574, 575 n.2 
(D.C. Cir. 1993); Brotherhood of R.R. Signalmen v. ICC, 63 
F.3d 638, 639 (7th Cir. 1995). Indeed some members of 
Congress also used the term "severance pay" as shorthand 
for the old New York Dock salary protections in debating the 
Whitfield Amendment. See 41 Cong. Rec. H12,302 col. 1 
(statement of Rep. Nadler); id. at H12,304 col. 3 (statement 
of Rep. Traficant); id. at H12,305 col. 2 (statement of Rep. 
Oberstar); id. at H12,306 col. 1-2 (statement of Rep. Spratt) 
(under old regime "Congress gave the ICC discretion to 
require 6-year severance payments to rail workers displaced 
by mergers or acquisitions").1 Both allowances were calculat-
ed on a monthly "time paid for" basis, which is the payment 
calculation scheme the Board has proposed for implementing 
the term "earnings" in section 10902(d) and which as part of 
the majority in Part III of the opinion I accept.2

__________
 1 Notably, the seminal ICC case discussing the evolution of the 
New York Dock conditions describes the employees who were 
eligible for displacement and dismissal allowances as "severed and 
dismissed employees." Oregon Short Line R.R. and Union Pacific 
R.R. Co.-Abandonment Portion Goshen Branch, 354 I.C.C. 76 (July 
22, 1977), available in 1977 ICC Lexis 75, *15.

 2 Of course, I do not accept the argument in Part III that the 
term "severance pay" is patently unambiguous on the one hand, but 
that we should defer to the Board's experience in administering 
"earnings"--an ambiguous term--on the other. Rather, we should 
interpret both terms guided by "an awareness of the practical 
expertise which an agency normally develops, and of a willingness 
to accord some measure of flexibility to such an agency as it 
encounters new and unforeseen problems over time." Internation-


 The panel argues that the Board has to rewrite the statute 
to provide for offsets to severance pay for employees who 
take lower paid positions in their old company in order to 
avoid giving them a windfall. Inevitably, as Judge Sentelle 
complains in his dissent, we do a bit of rewriting with respect 
to the term "earnings" in section 10902(d), Maj. Op. at 10, in 
order to arrive at a "fair and equitable arrangement." What 
is one judge's rewriting is another's gap-filling. In this case I 
believe that Congress probably focused on an offset for 
employment with the acquiring railroad in order to create an 
economic incentive for the acquiring railroad to hire workers 
displaced from the acquired line. Under the ICC regime, 
when Class II carriers were granted exemptions from labor 
protections, the average percentage of employees with the 
selling carrier who went to work for the new operator was 85 
percent. See 41 Cong. Rec. H12,303 col. 1 (statement of Rep. 
Shuster). Congress may well have wanted to keep that 
figure high by alleviating the new company's financial burden 
when that happened. When the Board later defined those 
included in the severance pay eligible group, it made the 
offset accommodation to make sure that affected employees 
played on a level field whether they took new jobs with their 
old company or went to work for the new one.

 Finally, and most important, the panel's rejection of the 
Board's interpretation creates a distinct and I believe inequi-
table anomaly in the treatment of affected railroad workers. 
Under the panel's interpretation, when an acquiring railroad 
(A) buys a line (line B) from the selling railroad (B), the 
following employees are entitled to severance pay: any work-
er dismissed from line B who takes a lower-paying job with 
A; any worker dismissed from line B who takes a lower-
paying job with any railroad other than B (in this case, A will 
have to pay the former B worker his full wages for a year 
with no offset); and any worker who keeps his same job but 
at a lower rate of pay on line B but who is now an employee 
of A. The only "employee[ ] who may be affected" by the 

__________
al Brotherhood of Teamsters v. Daniel, 439 U.S. 551, 566 n.20 
(1979), cited in Maj. Op. at 13.


acquisition who will not get any severance pay is one who 
loses his job on line B and takes a different lower-paying job 
with B. But presumably if that employee by dint of seniority 
bumps another worker in railroad B from his job, the bumped 
employee will be considered "severed" and will be entitled to 
severance pay. Such a disparity doesn't make sense and 
there is no signal from Congress that this is what it intended.

 For these reasons, I would defer to the Board's reasonable 
interpretation of section 10902(d) as to who is eligible for 
"severance pay," as well as the other challenged parts of its 
ruling.

 Sentelle, Circuit Judge, concurring in Parts I, II and IV 
and dissenting from Part III: I fully concur with the opinion 
of the court in Parts I and II. Indeed, I find the legal 
reasoning in Part II to be a commendably clear and unassail-
ably correct application of Chevron analysis. My difficulty 
with the majority's opinion lies in the fact that the cogent 
reasoning of Part II commands an opposite result than that 
reached by the court in Part III. I, therefore, respectfully 
dissent from the court's decision approving the Board's con-
struction of the term "earnings."

 I.

 As the court declares, "we review the Board's interpreta-
tion of the ICC Termination Act under Chevron's two-step 
analysis." Maj. op. at 6 (citing Chevron U.S.A. Inc. v. 
Natural Resources Defense Council, Inc., 467 U.S. 837 
(1984)). As the court further notes, it is our duty to "ask first 
'whether Congress has directly spoken to the precise question 
at issue. If the intent of Congress is clear, that is the end of 
the matter; for the court, as well as the agency, must give 
effect to the unambiguously expressed intent of Congress.' " 
Id. at 6 (quoting Chevron, 467 U.S. at 842-43). Only if the 
statute is " 'silent or ambiguous with respect to the specific 
issue' " before us do we proceed to the second step of 
determining " 'whether the agency's answer is based on a 
permissible construction of the statute.' " Id. (quoting Chev-
ron, 467 U.S. at 843). In the ICC Termination Act, 49 U.S.C. 
s 10101 et seq. (1997), Congress provided that the Surface 
Transportation Board "shall require any Class II rail carrier" 
receiving the expedited acquisition approval applicable in this 
case "to provide a fair and equitable arrangement for the 
protection of the interests of employees ... affected there-
by." Id. s 10902(d). Had Congress stopped there, there 
would obviously be a broad ambiguity as to the meaning of "a 
fair and equitable arrangement" and it might well be that we 
would uphold everything the Board did in this case. But, as 


the court's opinion demonstrates, Congress did not stop 
there.

 Congress went on to specify precisely what it meant by "a 
fair and equitable arrangement." As the court's opinion says, 
"[t]he ... Act specifies certain mandatory labor protection 
conditions, but expressly deprives the new Board of discretion 
to impose other labor protection conditions." Maj. op. at 3 
(citing 49 U.S.C.A. s 10902(c) (the Board "may require com-
pliance with conditions (other than labor protection condi-
tions) the Board finds necessary in the public interest")). As 
the court notes, this language is not only crystal clear, it is 
obviously expressive of the deliberate intent of Congress 
reached after debate and compromise. See id. at 8-9. In 
other words, Congress had determined and stated what it 
deemed to be the "fair and equitable arrangement" it was 
requiring. Therefore, there was no need for this court to 
reason beyond the first step of Chevron. Congress had 
determined what the Board could require a railroad conduct-
ing an expedited acquisition to provide to affected employees, 
and the Board was without discretion to expand it. I fear 
that the court departs from that unassailable reasoning in 
Part III.

 Just as Congress clearly capped the required payments 
under s 10902(d) at "one year of severance pay," Congress 
also clearly defined the method of computation of that benefit. 
The exclusive benefit "shall not exceed the amount of earn-
ings from railroad employment of the employee during the 
12-month period immediately preceding" the date of applica-
tion, which "shall be reduced by the amount of earnings from 
railroad employment of the employee with the acquiring 
carrier during the 12-month period immediately following the 
effective date of the transaction...." 49 U.S.C. s 10902(d) 
(emphasis added). Instead of following the congressional 
formula, the Board has adopted, and the court today allows, a 
computation in which the payment is not "reduced by the 
amount of earnings ... during the 12-month period" but 
instead allows reduction only for amounts computed monthly 
based not on the earnings of the affected employee, but 
rather on the per-hour return for the hours worked by that 


employee. Shortly put, Congress expressly mandated a re-
duction in the severance pay "by the amount of earnings from 
railroad employment" of the employee with the acquiring 
carrier during the relevant 12-month period. The Board, 
instead of following this plain mandate, reduces only when a 
reduction appears to it proper under a monthly computation 
based not on the earnings from railway employment, but on 
the hourly rate of the wage earner. The court, abandoning 
its allegiance to the clearly expressed intent of Congress 
demonstrated in Part II, approves this unwarranted assertion 
of authority under a misapplication of the Chevron doctrine.

 The court justifies its move to Step II of Chevron by 
declaring that "Congress has not 'directly spoken' to the 
question of precisely how the earnings offset should be calcu-
lated." Maj. op. at 11. To support this proposition, the 
majority offers the silence of the statute on whether earnings 
includes such things as "payroll deductions for health insur-
ance and employer contributions to pension benefits." Id. 
This, however, ignores the Supreme Court's plain language in 
Chevron. The deference we afford an agency under that 
decision arises when "the statute is silent or ambiguous with 
respect to the specific issue." 467 U.S. at 843 (emphasis 
added). Granted, the statute is ambiguous on what to do 
with medical and pension benefits. The statute is not ambig-
uous on the question of whether the severance pay "shall be 
reduced by the amount of earnings from railroad employment 
of the employee with the acquiring carrier during the 12-
month period immediately following the effective date of the 
transaction." 49 U.S.C. s 10902(d). It shall. There is no 
ambiguity as to whether the earnings to be used are monthly, 
hourly or annual. They are annual. They are not monthly 
computed, and they are not hourly adjusted. The payment is 
to be reduced by what the employee earns from railroad 
employment during the next 12-month period. That was the 
expressed intent of Congress. That should be the end of our 
analysis on this question.

 The majority further purports to find the ambiguity it 
seeks in the language of s 10902(d) which requires "that the 
Board fashion a 'fair and equitable' severance arrangement." 


Maj. op. at 11. Granted, that phrase taken out of the context 
of the statute may look ambiguous. But phrases in a statute 
are not without context. As the majority clearly demon-
strates in Part II, Congress defined what it meant by a "fair 
and equitable" arrangement. It said what that arrangement 
consists of. It consists of severance pay "reduced by the 
amount of earnings from railroad employment of the employ-
ee with the acquiring carrier during the 12-month period 
immediately following the effective date of the transaction." 
49 U.S.C. s 10902(d). The Board seizes the power of Con-
gress when it seeks to redefine that "fair and equitable 
arrangement," and this court today aids and abets it. I 
therefore dissent from that part of the opinion.

 II.

 I have thus far been silent as to Part IV of the majority 
opinion. I do concur in that section, but in doing so I wish to 
comment separately on what I understand the court not to be 
doing. As the majority notes, the Board requires the submis-
sion to arbitration of disputes regarding the application and 
implementation of the s 10902(d) conditions. The Board does 
so without any discernible explanation, rationale, or basis for 
its decision that it has the power to issue this requirement or 
the ability to make such delegation to a private arbiter. It 
cannot be gainsaid that the submission of a dispute to arbitra-
tion is normally a voluntary act, either at the time of the 
dispute or at an earlier time in a contract providing for such 
arbitration. It is equally undeniable "that when Congress 
has specifically vested an agency with the authority to admin-
ister a statute, it may not shift that responsibility to a private 
actor." Perot v. Federal Election Comm'n, 97 F.3d 553, 559 
(D.C. Cir. 1996); National Small Shipments Traffic Confer-
ence, Inc. v. ICC, 725 F.2d 1442, 1450 (D.C. Cir. 1984) (ICC 
may delegate certain ministerial functions to staff but deci-
sion making must remain with commission); Krug v. Lincoln 
Nat'l Life Ins. Co., 245 F.2d 848, 852 (5th Cir. 1957) (adminis-
trative agency cannot delegate quasi-judicial functions); Rel-
co, Inc. v. Consumer Prod. Safety Comm'n, 391 F. Supp. 841, 
845 (S.D. Tex. 1975) ("administrative adjudications" may not 


be delegated). That said, I nonetheless agree with the major-
ity that we must uphold the Board's unexplained delegation in 
this case.

 The reason for our anomalous holding is well set out by the 
majority. That is, circuit precedent forecloses the opposite 
result. In both Brotherhood of Locomotive Engineers v. ICC, 
808 F.2d 1570 (D.C. Cir. 1987), and International Bhd. of 
Elec. Workers v. ICC, 862 F.2d 330, 336 (D.C. Cir. 1988), we 
upheld similar delegations by the Board of disputes not 
submitted to voluntary arbitration by agreement of the par-
ties. Circuit precedent binds us unless and until it is over-
ruled by this court sitting en banc or by the higher authority. 
Save Our Cumberland Mountains, Inc. v. Hodel, 826 F.2d 43, 
49 (D.C. Cir. 1987), vacated in part, 857 F.2d 1516 (D.C. Cir. 
1988) (en banc). I, therefore, concur in the majority's deter-
mination that binding precedent requires us to uphold the 
Board's otherwise unsupported decision to delegate these 
disputes to private arbitration. I do not, however, under-
stand our decision to be providing any precedent for any 
other agency to act. Our precedent speaks by its terms and 
binds by its terms, and I do not think we are today intending 
to create a precedent empowering any other administrative 
agency to delegate disputes before it to private actors without 
the consent of the parties.

 I find one other aspect of the delegation troubling. The 
Board's position seems to be that the decision of the private 
arbitrators would be reviewed by the Board only under the 
restrictive "Lace Curtain" standards. See Chicago and 
Northwestern Transp. Co.-Abandonment-Near Dubuque and 
Oelwein, IA, 3 I.C.C.2d 729 (1987) (Lace Curtain), aff'd sub 
nom. International Bhd. of Elec. Workers v. ICC, 862 F.2d 
330 (D.C. Cir. 1988). The Board reiterated this proposition at 
oral argument. As I understand the Lace Curtain standard, 
the Board will only review the arbitrator's decision for "recur-
ring or otherwise significant issues of general importance 
regarding the interpretation" of labor protection conditions, 
and will not review decisions dealing with factual questions. 
Id. at 736. The Administrative Procedure Act entitles admin-
istrative litigants before the Board or any other administra-


tive agency to a review of the final agency decision under an 
arbitrary and capricious standard in which the reviewing 
court will subject fact findings to a substantial evidence 
review. See McCarty Farms, Inc. v. STB, Nos. 97-1632 and 
98-1307, 1998 WL 726248, at *7 (D.C. Cir. 1998); MD 
Pharm., Inc. v. Drug Enforcement Admin., 133 F.3d 8, 16 
(D.C. Cir. 1998) (explaining the standard of judicial review 
under the Administrative Procedure Act, 5 U.S.C. 
s 706(2)(A), (E)). I do not understand our decision today to 
be a statement that the Board can apply the Lace Curtain 
standard to involuntary arbitrations and thereby finesse a 
litigant out of that statutory right. If in future cases the 
Board attempts such a bypass of the statutory right, it may 
be that we will be required to directly review the arbitrator's 
decisions on such matters as final agency decisions, see 
International Bhd. of Elec. Workers, 862 F.2d at 337-38, or 
that some other remedy can be found. In any event, I do not 
read today's decision as approving the Board's standard of 
review.

 III.

 For the reasons set forth above, I concur in the decision of 
the majority as to the construction of the term "severance 
pay" but not as to its computation. As to that latter portion 
of the decision, I dissent.